Steven D. REICHEL, Appellant,

v.

STATE of Alaska, Appellee.

No. A–8555.

Court of Appeals of Alaska.

Nov. 12, 2004.

Brant G. McGee, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for the Appellant.

Timothy W. Terrell, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

In this appeal, we are asked to decide whether the police can conduct an investigative stop if they have a reasonable suspicion that a person is violating the conditions of their parole. The defendant asserts that Alaska law does not permit such an investigative stop unless the police are acting at the direction of a parole officer. The State asserts that Alaska law permits a stop to investigate a potential parole violation if the conduct involved in the parole violation meets the *Coleman–Ebona* test governing other investigative stops—that is, if the conduct involved in the parole violation creates an imminent public danger, or if it involves recent serious harm to persons or property. We conclude that we need not resolve this legal dispute because, even under the State's interpretation of the law, the facts of this case did not justify the investigative stop.

*Underlying facts*

On the evening of October 28, 2001, Steven D. Reichel was socializing at Alice's Champagne Palace, a bar and restaurant in Homer. Reichel was on parole from a felony DWI conviction, and Reichel's conditions of parole forbade him from consuming alcohol and from being on premises where alcoholic beverages are sold.

Homer Police Sergeant William Hutt was among a group of police officers who went to Alice's that evening to perform a "bar check". Hutt was personally acquainted with Reichel from previous contacts and arrests, including two or three arrests for earlier probation violations. Shortly after Hutt spotted Reichel, Reichel got up and left the bar.

Hutt suspected that Reichel was still on probation, and that Reichel was therefore forbidden from going to bars, so Hutt and his fellow officers followed Reichel outside. At the same time, Hutt called his dispatcher to request a records check on Reichel. The police dispatcher confirmed that Reichel was not supposed to consume alcohol or be on premises where alcohol is served.

(Hutt's suspicions were essentially correct, with the exception that Reichel was no longer on probation; rather, he was on parole. It was true, however, that Reichel's parole conditions forbade him from going to bars.)

Hutt and his fellow officers stopped Reichel outside the bar, and the officers held Reichel while they attempted to contact his parole officer to ask what to do. Within twenty minutes, the officers succeeded in speaking with Reichel's parole officer; the parole officer directed the officers to arrest Reichel for the parole violation. During a search of Reichel's person incident to this arrest, the police discovered cocaine in his pocket. This discovery ultimately led to Reichel's conviction for fourth-degree controlled substances misconduct.[1]

In this appeal, Reichel contends that the police acted unlawfully when they stopped him and held him outside the bar. Reichel concedes that he violated the conditions of his parole by going into the bar, but Reichel argues that this violation of parole was not a sufficient justification for an investigative stop.

*Reichel's main arguments*

Reichel argues that the investigative stop in his case was illegal for two reasons.

First, based on the Alaska Supreme Court's decision in *Roman v. State*,[2] Reichel argues that police officers have no authority to conduct a stop to investigate a potential parole violation unless the officers are acting at the direction of a parole officer.

Second, Reichel argues in the alternative that, even if police officers have independent authority to conduct an investigative stop

1.  AS 11.71.040(a)(3)(A).

2.  570 P.2d 1235 (Alaska 1977).

when they have a reasonable suspicion that a parolee has violated the conditions of parole, the investigative stop must still conform to the *Coleman–Ebona* rule.

■ Under Alaska law, police officers' authority to conduct investigative stops is more restricted than under federal law. In *Coleman v. State*[3] and *Ebona v. State*,[4] our supreme court held that police officers can conduct an investigative stop only if they have "reasonable suspicion that imminent public danger exists or [that] serious harm to persons or property has recently occurred".[5]

Reichel argues that even if the police reasonably suspected that Reichel had violated his conditions of parole by going to a bar and by drinking alcoholic beverages, the police had no basis for concluding that Reichel's unlawful conduct had harmed any person or property, nor any basis for concluding that Reichel's conduct created an imminent public danger. Thus, Reichel contends, the officers exceeded their authority under *Coleman* and *Ebona* when they stopped him outside the bar.

*The State's argument that there was no investigative stop*

■ The State's first response to Reichel's argument is that no investigative stop occurred—that the police merely approached Reichel outside the bar and asked if they could speak to him. The State argues that this was merely a "generalized request for information" rather than an investigative stop.

Alaska law recognizes the difference between investigative stops (which constitute "seizures" for constitutional purposes) and police-citizen contacts in which the police are merely seeking information without engaging in a show of authority.[6] Whether the police

engaged in an "investigative stop" or merely a "contact" hinges on the facts of each particular case.[7]

In Reichel's case, the superior court clearly viewed the encounter between Reichel and the police officers as an investigative stop—a stop that ripened into an arrest after the officers spoke with Reichel's parole officer. Even if the facts of that encounter might reasonably be construed to support the State's contention that no stop occurred, the superior court did not view the facts that way.

■ Of course, we are not bound by the superior court's *legal* conclusion. If the facts of this case—even when viewed in the light most favorable to Reichel—showed that no investigative stop occurred, we would have the authority to affirm the superior court's decision on this alternative ground.[8] But here, based on the testimony presented at the evidentiary hearing, the superior court could reasonably conclude that an investigative stop occurred. We therefore have no authority to re-evaluate that testimony and reach our own independent decision on this issue.

*The State's argument that the investigative stop was justified by a reasonable suspicion that Reichel was about to drive while intoxicated*

■ The State next argues that the investigative stop was justified under the *Coleman–Ebona* rule. The State points out that Reichel was on parole from a conviction for felony driving while intoxicated. The State argues that, because of Reichel's criminal history, and because the police found Reichel in a bar (and observed Reichel leave the bar soon after Sergeant Hutt spotted him), the officers had a reasonable suspicion that Rei-

---

**3.** 553 P.2d 40, 46 (Alaska 1976).

**4.** 577 P.2d 698, 700 (Alaska 1978).

**5.** *Coleman*, 553 P.2d at 46.

**6.** *See Howard v. State*, 664 P.2d 603, 608 (Alaska App.1983).

**7.** *See Martin v. State*, 797 P.2d 1209, 1214 (Alaska App.1990).

**8.** An appellate court is authorized to affirm a lower court's decision on any legal ground revealed by the record. *See Rutherford v. State*, 605 P.2d 16, 21 n. 12 (Alaska 1979); *Ransom v. Haner*, 362 P.2d 282, 285 (Alaska 1961); *Millman v. State*, 841 P.2d 190, 195 (Alaska App. 1992).

chel had been drinking and that he therefore posed an imminent danger to the public safety.

(This was not the legal theory advanced by Sergeant Hutt when he explained his reason for stopping Reichel, nor is it the legal theory that the superior court adopted when it upheld the investigative stop. However, as explained above, we are authorized to affirm the superior court's decision on any basis revealed by the record.)

In support of this argument, the State relies on our decision in *Smith v. State,* 756 P.2d 913 (Alaska App.1988). In *Smith,* a police officer observed the defendant driving a motor vehicle; a "locate" bulletin had been issued for this vehicle because the registered owner of the vehicle had had their driver's license suspended.[9] The officer stopped the vehicle to find out if the person he observed driving the vehicle was indeed the registered owner whose license had been suspended.[10] It turned out that Smith was not the registered owner—but, by coincidence, Smith's driver's license was also suspended, so the officer arrested her.[11]

On appeal, Smith argued that the officer violated the *Coleman–Ebona* rule when he stopped the vehicle. Smith contended that even if the officer had reasonable suspicion to believe that she was driving with a suspended license, this offense did not pose the "imminent public danger" required by *Coleman* and *Ebona.*[12] We rejected this argument:

> Driver's licenses may be suspended for a variety of reasons that are generally related to public safety.... It may well be correct, as Smith argues, that in many situations licenses are suspended for reasons having to do with a driver's inability to establish financial responsibility. [And we agree that] there is little reason to suppose that a driver whose license has been suspended for failing to provide proof of insurance poses any imminent public danger.
>
> Yet in many other situations, licenses are suspended precisely because a driver

has, through past driving conduct or offenses, demonstrated an actual inability to drive safely. When a driver in this category is behind the wheel, there is a legitimate basis for concluding that there may be imminent danger to other motorists. In most situations that—as in the present case—an officer who has a reasonable suspicion that a motorist is committing the offense of [driving with a suspended license] will not know the underlying basis for the license suspension. We believe that the level of danger in such instances is sufficiently high to permit a traffic stop.

*Smith,* 756 P.2d at 915–16.

The State argues that Reichel's case is analogous to the *Smith* case because the officers reasonably suspected Reichel of drinking in the bar, and because Reichel had a history of engaging in dangerous conduct (*i.e.,* intoxicated driving) when he consumed alcoholic beverages. But one aspect of Reichel's case differs from the facts of *Smith:* the testimony presented at the evidentiary hearing gives no indication that Reichel had driven to the bar or that Reichel intended to drive when he left the bar.

Because the State did not rely on this "impending DWI" theory when Reichel's case was litigated below, the superior court made no finding on the issue of whether the police had any indication that Reichel was about to drive when he left the bar. However, the testimony presented to the superior court strongly suggests that Reichel did not intend to drive. Reichel took the stand and testified that he called a taxicab before he left the bar, and that when he walked out of the bar he intended to depart in this cab. Reichel stated that he was about ten feet from the cab when the officers stopped him. Sergeant Hutt testified that he "believe[d] there was a cab there" when the officers stopped Reichel, although Hutt disclaimed knowledge of Reichel's precise intentions with respect to this cab.

---

**9.** *Smith,* 756 P.2d at 914.

**10.** *Id.* at 914–15.

**11.** *Id.* at 915.

**12.** *Id.*

The State argues that an investigative stop was justified even if there was no affirmative indication that Reichel intended to drive. The State suggests that even if Reichel intended to leave in a taxicab, "the officers [who] followed Reichel out of the bar . . . had no way of knowing that he would . . . take a cab". The State further suggests that even if Reichel had taken a cab, "it is still possible that he would have driven [another vehicle] once he reached a location . . . safely away from the officers".

■ But an investigative stop can not be grounded on a police officer's lack of knowledge as to whether a person might commit an offense, or an officer's speculation about a person's proclivity to commit a future offense. Rather, it is the State's burden to show that the officers who performed the stop had *affirmative reasons* to believe that an offense had just been committed or was about to be committed.

In Reichel's case, before the officers could stop Reichel on suspicion that he was about to drive while intoxicated, the officers had to have some affirmative reason to believe (1) that Reichel was indeed intoxicated (as opposed to having simply consumed an alcoholic beverage), and (2) that Reichel was about to drive. The record is silent on the issue of whether Reichel gave the officers any reason to believe that he was intoxicated, and the record supports Reichel's assertion that he did not intend to drive.

The State argues that, even without affirmative evidence that Reichel was intoxicated or that he intended to drive, the police were entitled to stop Reichel simply because they had reason to believe that he had been drinking and because they knew that he had previously been convicted for driving while intoxicated. The State contends that, under these facts, the police could reasonably fear that Reichel might drive while intoxicated in the near future.

But under the State's theory, the police would have the authority to conduct an investigative stop of any person with a prior conviction for driving while intoxicated based merely upon a reasonable suspicion that the person had consumed some amount of alcohol at a social gathering. Moreover, applying the State's theory to the situation presented in *Smith* (*i.e.*, situations in which the police have reason to believe that a person's driver's license has been suspended), the police would have the authority to conduct an investigative stop of anyone whose driver's license was suspended if the police saw that person walking through or toward the parking lot of a shopping mall. This would be an unwarranted—and unconstitutional—expansion of police authority to conduct investigative stops.

For these reasons, we conclude that the investigative stop in this case was not supported by a reasonable suspicion that Reichel was about to drive while intoxicated.

*The State's argument that the investigative stop was justified because the officers had a reasonable suspicion that Reichel had just violated the conditions of his parole*

This brings us to the State's third argument: the argument that the investigative stop was justified because the officers had a reasonable suspicion that Reichel had just violated the conditions of his release (by going into the bar). This is one of the theories adopted by the superior court when the court denied Reichel's motion to suppress.

Under its "violation of parole" theory for upholding the stop, the State argues that the *Coleman–Ebona* rule should be construed to allow the police to conduct investigative stops, not only when the officers reasonably suspect recent or impending criminal conduct, but also when they reasonably suspect a recent or impending violation of probation or parole, so long as this violation "involve[s] conduct serious enough to satisfy the *Coleman* standard"—*i.e.*, so long as the conduct creates an "imminent public danger" or it involves "[recent] serious harm to persons or property".

■ Reichel contends that the State's argument is foreclosed by the Alaska Supreme Court's decision in *Roman v. State*, 570 P.2d 1235 (Alaska 1977). In *Roman*, the supreme court held (as a matter of Alaska constitutional law) that prisoners released on parole have the same protections against government searches and seizures as other citizens,

"except [when] reasonably conducted searches and seizures are required by the legitimate demands of correctional authorities", and when the authority to conduct such searches and seizures "[is expressly] set forth [in the parolee's] conditions of parole by the Parole Board".[13]

The defendant in *Roman* had been granted parole release from his sentence for possession of heroin.[14] Roman later violated his conditions of release, but (following a hearing) the Parole Board decided not to revoke his parole. Instead, Roman's parole officer drafted a series of supplemental conditions of parole to govern Roman's conduct in the future.[15] One of these conditions required Roman to "[s]ubmit [his] person, vehicle and dwelling to search for contraband on demand by any parole officer or peace officer".[16]

The supreme court held that this parole condition was unconstitutional to the extent that it purported to grant police officers independent authority to require Roman to submit to a search:

> The right to perform such searches is limited to parole officers and peace officers acting under their direction.... [T]he authorization for searches [in Roman's case] was too broad [because it subjected] Roman to searches other than by or at the direction of parole officers.

*Roman*, 570 P.2d at 1243 & n. 26. The supreme court added that, "[i]n the future, we believe that [any] conditions of parole authorizing searches should be specified by the Parole Board and [should] not [be] left to the discretion of individual parole officers." [17]

These two aspects of the *Roman* decision are now codified in AS 33.16.150. This statute governs the Parole Board's authority to impose conditions of release on prisoners who are paroled. Subsection (a) of the statute lists twelve conditions of release that must be imposed on all parolees. Subsection (b) of the statute then lists an additional eleven conditions of release that the Parole Board may, in its discretion, impose on a particular parolee. Under subsection (b)(3), the Parole Board may require a parolee to

> submit to reasonable searches and seizures by a parole officer, or [by] a peace officer acting under the direction of a parole officer[.]

Thus, subsection (b)(3) echoes the holding in *Roman*—the constitutional ruling that, except when acting at the direction of a parole officer, police officers may not subject parolees to searches or seizures that would be unconstitutional if performed on the person or property of other citizens.

Based on *Roman,* Reichel argues that police officers can not detain a parolee to investigate a suspected parole violation unless either (1) the suspected parole violation involves conduct that would constitute an independent crime, or (2) the officers are acting at the direction of a parole officer. Thus, Reichel reasons, the investigative stop in his case was unconstitutional.

We conclude that we need not resolve these issues concerning the interplay between the *Roman* decision and the *Coleman–Ebona* rule. As explained above, the State does not argue that police officers are authorized to conduct an investigative stop whenever they have a reasonable suspicion that a parole violation is occurring or has just occurred. Rather, the State takes the position that police officers are entitled to conduct an investigative stop if they have a reasonable suspicion (1) that a parole violation is occurring or has just occurred, *and* (2) that the conduct involved in this violation of parole meets the *Coleman–Ebona* test—*i.e.,* that the parole violation creates an "imminent public danger" or it involves "[recent] serious harm to persons or property".

As we explained earlier in this opinion (when we rejected the State's argument that the police had a reasonable suspicion that Reichel was about to drive while intoxicated), the facts known to the police when they stopped Reichel did not provide reason to believe that an imminent public danger exist-

---

**13.**  *Roman,* 570 P.2d at 1237.

**14.**  *Id.*

**15.**  *Id.*

**16.**  *Id.*

**17.**  *Id.* at 1243–44.

ed or that serious harm to persons or property had just occurred. The officers knew that Reichel had just been inside the bar. They might reasonably have suspected that Reichel had consumed alcoholic beverages while in the bar. And they reasonably suspected that Reichel's conditions of release forbade him from engaging in these activities. But these facts, even in combination, do not amount to a reasonable suspicion that Reichel posed an imminent danger to the public.

Thus, even under the State's interpretation of the law—that is, even assuming that the *Coleman–Ebona* rule allows the police to conduct investigative stops based on reasonable suspicion of a serious parole violation— the facts of Reichel's case would not support the investigative stop. For this reason, we conclude that the parties' various arguments concerning the proper interpretation of *Roman* and the *Coleman–Ebona* rule are moot.

*The superior court's alternative rationale for upholding the investigative stop*

In addition to the theories that we have already discussed, the superior court ruled that the investigative stop was justified because Reichel's conditions of parole required him to submit to a breath test or to a search for controlled substances at the request or direction of any police officer. On appeal, the State does not defend this rationale for the investigative stop. As we explained in the preceding section of this opinion, the Alaska Supreme Court's decision in *Roman v. State* holds that these conditions of Reichel's parole are unconstitutional.

*Conclusion*

Reichel's suppression motion should have been granted. Accordingly, the judgement of the superior court is REVERSED.