Illya D. BROWN, Appellant,

v.

STATE of Alaska, Appellee.

No. A–8793.

Court of Appeals of Alaska.

Jan. 13, 2006.

Marcia E. Holland, Assistant Public Defender, Fairbanks, and Barbara K. Brink, Public Defender, Anchorage, for the Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and David W. Márquez, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

Probation Officer Shawn Davies was looking for one of his probationers, Richard Wolters, so that he could confront Wolters about apparent violations of probation (failure to report and use of controlled substances). Davies took up an early morning surveillance outside Wolters's residence. He saw a man emerge from the residence and get into a cab. Thinking that this man was Wolters, Davies called for police assistance in stopping the cab.

A Fairbanks police officer stopped the cab, and Davies arrived on the scene moments later. But the passenger in the cab was not the sought-for Wolters, but rather Illya Brown—who, coincidentally, was a felony parolee under Davies's supervision.

Shortly after Davies arrived, Brown ran away from the scene of the traffic stop. But before he ran away, Brown dropped a bag containing packets of cocaine and items of drug paraphernalia.

Brown was indicted for possessing this cocaine with the intent to distribute (third-degree controlled substance misconduct under AS 11.71.030(a)(1)). He asked the superior court to suppress the evidence against him, arguing that the probation officer and the police officer had no authority to stop the cab. After the superior court denied this motion, Brown entered a Cooksey plea, reserving his right to renew his suppression arguments on appeal.[1]

For the reasons explained here, we conclude that all of Brown's arguments are either unpreserved or meritless. Accordingly, we affirm his conviction.

### Underlying facts

In late December 2001, Probation Officer Shawn Davies was trying to make contact with one of his probationers, Richard Wolters. Wolters had apparently violated the conditions of his probation by not staying in contact with Davies and by using cocaine. (Wolters had recently submitted a urine sample that tested positive for cocaine.) Davies had been telephoning Wolters and leaving messages for him, but Wolters had not returned any of these calls.

In the early morning of December 28th (sometime after 7:00 a.m.), Davies again telephoned Wolters. A man answered the telephone, but he claimed that he was not Wolters. The man told Davies that Wolters had left for a doctor's appointment.

Despite the man's claim that he was not Wolters, Davies thought that he recognized Wolters's voice. Suspecting that he was being tricked, Davies decided to drive over to Wolters's residence to see whether Wolters was truly not at home. Davies arrived outside Wolters's residence at approximately 7:40 a.m. A few minutes later, Davies observed a man emerge from the residence and get into a cab. Davies could not see this man's face because the man was wearing a hooded outer garment and because the man was huddled over, apparently holding things in his arms. However, given the circumstances, Davies believed that this man was Wolters, and that Wolters was again trying to avoid contact with him.

Davies got into his car and began following the cab. According to his later testimony at the evidentiary hearing, Davies wished to make contact with Wolters, ask him why he was avoiding Davies, and conduct a search of his person. Davies also testified that, based on Wolters's violations of his probation—Wolters's failure to report to Davies, and Wolters's apparent use of cocaine (based on the test result of his urine sample)—Davies would have been authorized to arrest Wolters. See AS 33.05.070(a).

While Davies was following the cab, he used his cell phone to contact the Fairbanks Police Department and request their help in stopping the cab. In response to this request, Officer Perry J. Williamson performed a traffic stop of the cab. Davies was driving right behind Williamson when the traffic stop was made, so Davies arrived on the scene only seconds later.

Almost immediately, the passenger emerged from the cab unbidden. When the passenger got out of the cab and into the light, both Davies and Williamson saw that this passenger was not Richard Wolters. (Both men were acquainted with Wolters.) Instead, Davies recognized the passenger as Illya Brown, a felony parolee under his supervision.

Brown began talking to Officer Williamson, but he also began backing up, with his right hand under his coat. Williamson directed Brown to take his hand out of his coat and to place his hands on the cab, but Brown did not obey. At this point, Williamson drew his

---

1. *Cooksey v. State,* 524 P.2d 1251 (Alaska 1974).

side arm and directed Brown to stand still. In response, Brown ran away.

Davies and Williamson chased Brown, but they could not catch him. However, when the two officers returned to the cab, they discovered a black knit bag containing packets of cocaine and items of drug paraphernalia.

*Brown's argument in the superior court and details of the superior court's ruling*

Following his indictment for controlled substance misconduct, Brown asked the superior court to suppress the black knit bag and its contents. In his memorandum in support of the suppression motion, Brown argued that even if Wolters had been the passenger in the cab, Davies would have had no authority to stop the cab (or to ask the police to stop the cab) unless Davies had a reasonable suspicion that "imminent public danger existed or [that] serious harm to persons or property ha[d] recently occurred"— the justification required for investigative stops under the Alaska Supreme Court's decisions in *Coleman v. State* and *Ebona v. State*.[2]

In other words, Brown argued that Davies (a probation officer) had no greater authority to conduct an investigative stop of Wolters (a probationer under his supervision) than the authority that any police officer would possess to conduct an investigative stop of any citizen. In the words of Brown's memorandum, "Probation Officer Davies' authority to supervise ... Wolters provided him with no broader right to direct [the police to stop the] cab ... than [the right] articulated by *Coleman* ...." Brown further contended that if the *Coleman* test was applied to the circumstances of his case, there was no justification for the stop of the cab because Davies "had no suspicion that ... Wolters ... was engaged in any form of illegal conduct".

In two isolated sentences of his superior court memorandum, Brown asserted that Davies "had [no] ability to identify ... the person he saw entering the cab", and that Davies "could not have believed that the person he saw entering the cab was Richard Wolters". But in both instances, immediately after asserting this, Brown told the superior court that the accuracy or reasonableness of Davies's identification was not really the point:

> But even assuming that [the] identification [was] properly made, ... the stop was not based [on] reasonable suspicion that [Wolters] was engaging in illegal conduct, [and thus] it was impermissible.
>
> . . .
>
> [N]o basis existed for stopping the cab, even assuming that [Davies] legitimately believed that Mr. Wolters was the passenger in that vehicle. As a result, all evidence obtained as a result of the traffic stop initiated at Mr. Davies' request should be suppressed.

(Brown's superior court memorandum, augmented by a later supplemental memorandum, presented two additional arguments. First, Brown argued that even if the stop of the cab was lawful, there was no justification for ordering Brown to place his hands on the cab and remain at the scene after the officers discovered that he was not Wolters. Second, Brown argued that the officers could not justify their actions by relying on Brown's own condition of probation (a condition allowing warrantless searches of his person and any vehicle under his control) because that condition of Brown's probation was unconstitutional. Brown does not renew either of these arguments in this appeal.)

Superior Court Judge Mark I. Wood held an evidentiary hearing on Brown's suppression motion. At the end of this evidentiary hearing, when the parties summarized their positions, Brown renewed his argument that the *Coleman–Ebona* test governed the stop of the cab, and that the stop of the cab was thus unlawful because Davies "had no independent basis to believe that any kind of crime had been committed.... [Davies] simply was exercising ... his supervisory powers to make contact with a probationer."

---

**2.** *Coleman v. State*, 553 P.2d 40, 46 (Alaska 1976); *Ebona v. State*, 577 P.2d 698, 700–01 (Alaska 1978).

Brown also argued, essentially for the first time, that the stop was invalid because Davies could not reasonably have mistaken Brown for Wolters:

> *Defense Attorney:* Mr. Brown is a dark-complected black male who is 6'4" tall and weighs 235 pounds. Mr. Wolters ... is 5'7" tall and weighs 175 pounds[, and he] is a Caucasian male. The dissimilarities between [their] physical appearances ... are staggering and ... undeniable. There is no way that Mr. Brown ... and Mr. Wolters could be mistaken for one another. Certainly, there is no way that [such a mistake] could have happened ... if [Davies had made] some sort of reasonable effort ... to make an identification[.]

Finally, Brown argued that even though Wolters's conditions of probation included a clause that made him (Wolters) subject to suspicionless *searches*, this condition of probation did not make Wolters subject to suspicionless *seizures* (in this case, the traffic stop). Brown asserted that any seizure of his person had to meet the *Coleman–Ebona* test—even if that seizure was performed by a probation officer attempting to conduct an authorized suspicionless search of Brown's person. Brown's attorney told the court:

> *Defense Attorney:* [T]his [was] a seizure, and not a search [falling] within the scope of [Wolters's probation condition]. It goes beyond any reasonable interpretation of ... Mr. Wolters's [conditions of] probation.... [N]o authority ... to effect a seizure—a traffic stop—[arose] under the ... conditions of probation to which Mr. Wolters was subject.

> ...

> *The Court:* Let me just ask you a question. This is just thinking [out loud], but it seems to me that the right to search [a probationer] necessarily includes the right to detain [the probationer] to accomplish the search.

> *Defense Attorney:* Well, Judge, I think there is a ... significan[t] [difference] between [this case and] circumstances where a probation officer shows up after a stop has been effected for [an independent] reason and [the probation officer] instructs [a police] officer to conduct a search pursuant to the conditions of probation....

> *The Court:* So you [assert] that a probation officer who wanted to search a probationer would not have the right to ask a police officer to detain the probationer under any circumstances?

> *Defense Attorney:* Well, not unless ... the police officer had an independent basis for the initial [stop].

After hearing these arguments, Judge Wood denied Brown's suppression motion.

Judge Wood acknowledged that Wolters and Brown did not look much like each other. The judge declared that "if [the two men] were to stand directly side-by-side, [nobody] would have any trouble telling them apart." However, Judge Wood then indicated how Davies might reasonably have mistaken Brown for Wolters:

> *The Court:* Mr. Davies was worried about Mr. Wolters ... because Mr. Wolters had ... a "hot" UA [*i.e.,* a urine sample that tested positive for drugs] [and] because it appeared that Mr. Wolters was trying to avoid him. He was [also] worried ... because he had called up [Wolters's] house, and the voice that he heard on the other end sounded similar to Mr. Wolters's.... [Davies] even called him on it, and the guy denied [being Wolters]. But Mr. Davies was convinced [that] it was Mr. Wolters, and [that] Mr. Wolters was getting ready to leave his residence. And so [Davies] changed [his] clothes, went out to Mr. Wolters's residence, and took up surveillance [from at least 50] yards away.

> ...

> [T]he upstairs apartment [we are talking about] is covered and dark, and there's no light ... at the top of the stairs.... [A]nd remember [that] this is December 28th ..., so we're talking about dark winter in Fairbanks at ... 7:40 in the morning. An individual comes out of that upstairs apartment, and ... a couple of seconds [later he's] in the cab. He's hooded and, you know, everybody [looks] stocky in the winter ... because of the nature of the clothing that we wear. When you're wearing a hooded parka, everybody looks stocky.

Judge Wood conceded that, had the circumstances been a little different—"if [Brown] had come out [of the apartment] with somebody else, [so] there was some [point] of reference ... to measure [his] height, [or] if it [had been] summer, [so that] the man didn't have a coat on"—then the judge might well have granted Brown's suppression motion. Judge Wood stated that, if these other circumstances had been present, "[the defense attorney's] excellent presentation on the differences between Mr. [Brown] and Mr. Wolters would have made a huge difference in this case."

But Judge Wood concluded that, "given the dark, the distance, the winter [clothing], the location, and the very brief time that Mr. [Brown] was observed, Mr. Davies in his mind ... thought it was Mr. Wolters coming out [of the apartment and getting into the cab]."

Judge Wood then turned to Brown's argument that, even though a probation officer might have the right to search a probationer, a probation officer has no right to stop and temporarily detain the probationer in order to perform this search:

> *The Court:* I disagree with [the defense attorney]. I think that the right to search also involves the right to reasonably detain. [And] I think that the detention of the [cab] was reasonable under the circumstances.

That is, Judge Wood concluded that Davies had the authority to stop the vehicle in which Wolters was riding, even in the absence of particularized suspicion, simply to perform the suspicionless search authorized by Wolters's conditions of probation.

Judge Wood then held, in the alternative, that the vehicle stop was justified because Davies reasonably believed that Wolters had violated the terms of his probation:

> *The Court:* Alternatively, I feel that Officer Davies had a more than reasonable suspicion that Mr. Wolters ... had violat-

ed the conditions of his probation. [Wolters was] a drug seller [who was convicted of] misconduct involving controlled substances in the third degree. [He had] a hot UA, [and he was] having difficulties contacting his probation officer.... [Y]ou've got a convicted felon in violation of his probation, and ... that's a serious thing. And that's the type of thing [that] we want our probation officers stopping and contacting [their] probationers about. And so I think that there's reasonable grounds to contact Mr. Wolters.

On these alternative grounds, Judge Wood concluded that the traffic stop was lawful.

(This was not the end of Judge Wood's analysis of the case, but his remaining remarks were devoted to the additional issues, described above, that Brown does not pursue on appeal.)

*Brown's arguments on appeal, and our analysis of this case*

■ To analyze the legality of the stop in this case, it is useful to begin with a hypothetical situation in which Wolters was indeed the passenger in the cab and Davies, acting without police assistance, flagged down the cab in an attempt to speak to Wolters about his recent violations of probation and to conduct the search authorized by Wolters's conditions of probation.

In his brief to this Court, Brown (now represented by a different attorney) argues that even when a probationer is subject to a probation condition that seemingly authorizes a probation officer to conduct suspicionless searches, a probation officer has no legal authority to search a probationer unless the officer has a reasonable suspicion that the probationer is currently engaged in criminal behavior.[3]

And, based on this assertion that Davies had no authority to search Wolters, Brown concludes that Davies (even if acting alone) had no authority to stop the cab in which

---

3. Brown's brief asserts: "[Judge Wood's] reliance on the ... probation conditions imposed on Mr. Wolters [is] problematic in that, even if Mr. Wolters had been personally contacted by Mr. Davies, there does not appear to be any legal authority to support a search of Mr. Wolters's person, residence, or vehicle unless there was reasonable suspicion of criminal activity. Mr. Davies had no information that Mr. Wolters was currently engaging in criminal activity on the day that Mr. Davies directed that the [cab] be stopped."

Wolters was believed to be riding: "Given that there was no clear legal authority [for Mr. Davies] to search Mr. Wolters, there certainly was no legal authority to rely on the search conditions [of Wolters's probation] to ... seize a moving vehicle [in which Wolters was riding]."

■ Brown is wrong about the extent of Davies's authority to search Wolters. Because Wolters's conditions of probation authorized Davies to conduct a suspicionless search, no particularized suspicion was necessary. In *Soroka v. State*, 598 P.2d 69 (Alaska 1979), the Alaska Supreme Court declared:

> If the conditions of [a person's] probation [authorize] searches on demand ..., no showing of probable cause [is] necessary. [Citations omitted] Searches authorized in connection with grants of probation or parole may be executed without the need for additional justification, as long as they are reasonably conducted and not made for purposes of harassment. *Roman v. State*, 570 P.2d [1235,] 1242 and n. 19 [(Alaska 1977)].

*Soroka*, 598 P.2d at 71 n. 5 (citations omitted). *See also State v. James*, 963 P.2d 1080, 1082 (Alaska App.1998) (recognizing and applying this aspect of the *Soroka* decision).

■ Brown insists that the federal and the Alaska constitutions prohibit suspicionless searches of probationers, even when a condition of probation purports to authorize such searches. But Brown does not mention *Soroka* in his opening brief, nor does he mention *Soroka* in his reply brief, even though the State's brief explicitly relies on the passage from *Soroka* that we have just quoted.

In any case, Brown's argument is not preserved because it was never made to the superior court. As explained above, Brown's trial attorney conceded that Wolters's conditions of probation authorized suspicionless searches, but he argued that the probation officer's authority to engage in suspicionless searches did not confer a corresponding authority to engage in *seizures* (a vehicle stop

or other form of investigative stop) to conduct these searches. Judge Wood rejected this argument, ruling that "the right to search also involves the right to reasonably detain".

Following Judge Wood's ruling, Brown entered a *Cooksey* plea that authorized him to renew, on appeal, the arguments that he presented to Judge Wood. But Brown is not authorized to raise new arguments.

■ We therefore turn to the argument that Brown *did* preserve: the argument that even though a probation officer may be authorized by the conditions of probation to conduct a suspicionless search of a probationer, this authority does not include the right to temporarily seize and detain the probationer for the purpose of conducting the search.

For this proposition, Brown relies primarily on our decision in *Reichel v. State*, 101 P.3d 197 (Alaska App.2004).

In *Reichel*, we were confronted with a situation in which police officers, acting independently of a probation officer, performed an investigative stop of a probationer whom the officers reasonably suspected of violating (or having just violated) the conditions of his probation, but in a manner that did not constitute a new crime. (The officers observed the probationer in a bar, and they suspected that he had been drinking.) [4]

In *Reichel*, the State took the position that police officers have the authority (even when operating independently of a probation officer) to perform an investigative stop of a probationer if the suspected violation of probation meets the *Coleman–Ebona* test: that is, if the violation of probation, although not in itself a crime, nevertheless involves an imminent public danger or recent serious harm to persons or property.[5] We ultimately concluded that we did not need to decide whether to endorse the State's proposed rule of law: under the facts of *Reichel*, the *Coleman–Ebona* test was not met, and thus the State's argument was moot.[6]

4. *Reichel*, 101 P.3d at 198.

5. *Id.*

6. *Id.* at 202–03.

Brown appears to contend (particularly in his reply brief) that *Reichel* established the rule that police officers who are acting independently of probation officers have no authority to conduct an investigative stop of a probationer unless the police have reasonable suspicion that the probationer is violating (or has just violated) the law. (This is a mistaken interpretation of *Reichel:* as we explained in the preceding paragraph, *Reichel* does not decide this question.)

Brown then asks us to expand this purported rule so that the same requirement (the requirement of reasonable suspicion of a crime) would apply to probation officers and to police officers acting at the direction of probation officers. In other words, Brown argues that neither probation officers nor police officers acting at their behest can subject a probationer to a suspicionless investigative stop. Brown contends that even when a probationer's conditions of probation authorize a probation officer to conduct a suspicionless search of the probationer's person, neither the probation officer nor police acting at the probation officer's direction are authorized to detain the probationer in the absence of reasonable suspicion that the probationer is violating (or has just violated) the criminal law.

The Alaska Supreme Court's decision in *Roman v. State*, 570 P.2d 1235 (Alaska 1977), indicates that Brown is wrong and that Judge Wood was correct: a probation officer's authority to search carries with it the authority to temporarily detain the probationer in order to conduct the search.

The defendant in *Roman* was on parole from a conviction for possession of heroin. After Roman's parole officer received a tip that Roman had used heroin the day before, the parole officer went to the Fairbanks airport (where Roman was waiting for a flight) to obtain a urine sample from Roman. (Roman's parole conditions obliged him to provide urine samples when requested to do so by a parole officer.) Enlisting the aid of another parole officer and an airport security officer, Roman's parole officer detained Roman and took him to a restroom in an at-tempt to get the urine sample. After Roman declared that he was physically unable to provide the requested sample, the parole officer moved Roman from the restroom to the customs area, where the parole officer performed a search of Roman's person.[7]

The supreme court upheld the legality of these actions. In its decision, the court indicated that both the search *and the detention to perform the search* were proper:

> The right to request specimens for urinalysis and to search [a parolee] and his quarters at reasonable times and in a reasonable manner to assure that he would not continue to possess illegal drugs is necessary to the proper functioning of the parole system. The right to perform such searches is limited to parole officers and peace officers acting under their direction. It would appear that all of these conditions were met in the search of Mr. Roman; therefore, we cannot find that the parole authorities were clearly mistaken in authorizing the search and in conducting it under these circumstances. Roman's inability to furnish a specimen for urinalysis prevented use of that means of ascertaining whether he was using drugs; *and, in view of his imminent departure, it was reasonable to search his person at that time.*

*Roman,* 570 P.2d at 1243 (emphasis added) (footnotes omitted).

Given the supreme court's decision in *Roman,* we conclude that if a probationer's conditions of probation authorize suspicionless searches of the probationer's person, a probation officer who wishes to exercise this authority has the concurrent right to stop and temporarily detain the probationer in order to conduct the search (subject to the limitations expressed in *Roman:* that the search must be conducted at a reasonable time and in a reasonable manner, and that the search must not be conducted for the purpose of harassing the probationer).[8]

Judge Wood expressly found that Davies's decision to stop the cab "was reasonable under the circumstances", and this finding is

---

**7.** *Id.* at 1237–38.

**8.** *Roman,* 570 P.2d at 1242.

supported by the record. Moreover, there is no suspicion of harassment here. Judge Wood found—and Brown does not contest—that Davies had reasonable grounds for believing that Wolters was in violation of his probation, both for failing to report and for using drugs (because of the "hot" urinalysis). We therefore hold that Davies could lawfully decide to conduct a temporary investigative stop of the cab.

■ The next issue is whether Davies could lawfully enlist the assistance of the police to help him conduct this investigative stop. Brown appears to argue that even if Davies might lawfully have conducted the investigative stop himself, the stop became unlawful when Davies asked the police to help him. That is, even if the *Coleman–Ebona* test would not apply to Davies's own actions, the cooperation of the police triggered the *Coleman–Ebona* requirement.

Brown offers no legal authority in support of this proposition (other than *Reichel,* a decision which we conclude is not pertinent). And Brown's argument is at odds with the accepted law in this area:

> [We turn now to the question of] whether the less demanding Fourth Amendment limits [that apply to searches conducted by probation and parole officers] apply even when there was some police involvement in the activity....
>
> Generally, ... searches of probationers and parolees [that do not conform] to usual Fourth Amendment standards have been upheld notwithstanding the fact that there was some degree of cooperation or joint participation by the police and a probation or parole [officer]. There is little reason to question this result when the facts show that [the] police participation was brought about at the instigation of the probation officer or parole officer, for [the officer] may enlist the aid of police officers in performing his duty.

Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (4th ed.2004), § 10.10(e), Vol. 5, pp. 470–71 (internal citations omitted).

As the Eighth Circuit recently declared in *United States v. Brown,* 346 F.3d 808 (8th Cir.2003), "[T]he Fourth Amendment does not require probation officers to choose between endangering themselves by searching alone [or, alternatively,] foregoing the search because they lacked the resources and expertise necessary to search alone safely." [9] We believe that this principle is particularly apt when the probation officer's search requires the investigative stop of a motor vehicle.

We note that, in *Roman,* the parole officer enlisted the aid of the airport security police; the supreme court never indicated that the participation of airport security officers altered its analysis of the case in any way.

Accordingly, we hold that Davies's decision to enlist the aid of the police in effecting the stop of the cab did not alter the legality of the stop.

■ Finally, Brown argues that the stop of the cab was illegal because Davies did not have probable cause to believe that it was Wolters (his probationer) who emerged from the apartment and got into the cab.

This argument was not presented to Judge Wood. From the beginning, it was obvious that Davies had made a mistake concerning the identity of the man in the cab. But, as explained above, Brown's written pleadings barely mention Davies's mistake. Only two isolated sentences of Brown's memorandum refer to this mistake and, in both instances, the reference is immediately followed by an assertion that Davies's mistake was irrelevant to the decision of Brown's suppression motion.

We acknowledge that Brown's argument changed at the close of the evidentiary hearing. When Brown's attorney argued the suppression motion orally at the end of the hearing, he expressly asserted that the stop of the cab was unjustified because Davies acted unreasonably when he concluded that Wolters was the man he had seen get into the cab. Specifically, the defense attorney told Judge Wood: "There is no way that Mr. Brown ... and Mr. Wolters could be mistaken for one another. Certainly, there is no way that [such a mistake] could have hap-

9. *Brown,* 346 F.3d at 812.

pened ... if [Davies had made] some sort of reasonable effort ... to make an identification[.]"

But, as explained above, Judge Wood rejected the defense attorney's contention; the judge found that, under the circumstances, Davies's mistake was reasonable. Judge Wood noted that Davies reasonably expected that it would be Wolters who emerged from Wolters's residence at 7:40 in the morning. And when the man did come out of Wolters's apartment and got into the cab, Davies got a glimpse of him for only a couple of seconds. Moreover, it was dark, and Brown was wearing heavy winter clothing that hid his face and concealed his physique.

Thus, the record shows that Judge Wood found that Davies acted reasonably—that Davies had at least a reasonable suspicion that the man he saw get into the cab was Wolters, the probationer who had been avoiding him and who had recently submitted a dirty urine sample.

Brown argues that, given the facts of this case, Judge Wood's resolution of this issue was erroneous. Brown asserts that Davies unreasonably jumped to the conclusion that the man who came out of Wolters's apartment was indeed Wolters. Brown argues that Davies should have done more to verify the identity of this man before he requested that the police stop the cab.

After reviewing the record, we conclude that the facts of this case (viewed in the light most favorable to Judge Wood's ruling) adequately support the judge's ruling that Davies's mistake was reasonable under the circumstances—that Davies reasonably (albeit erroneously) suspected that the man who emerged from the apartment and got into the cab was Wolters.

Brown argues, in the alternative, that a reasonable suspicion was not enough to justify Davies's actions—that probable cause was required. But the words "probable cause" are found nowhere in Brown's trial court pleadings or in the argument that Brown's trial attorney presented orally to Judge Wood at the close of the evidentiary hearing. Brown's trial attorney never argued that "probable cause" was the legal test

to be applied to Davies's level of knowledge concerning the identity of the man in the cab. Instead, as just explained, Brown's trial attorney argued that Davies had acted unreasonably, and Judge Wood rejected that argument.

The record therefore indicates that Brown failed to preserve his argument that the proper standard is "probable cause". However, at oral argument, Brown's appellate attorney asserted that the "probable cause" argument was indeed preserved because (1) Brown's trial attorney argued to Judge Wood that the applicable standard was "absolute certainty", and thus (2) "probable cause" was merely a lesser version of this proposed standard.

There is nothing in the record to support this contention. Brown's trial attorney never argued that the State was obliged to prove that Davies was absolutely certain that the man in the cab was Wolters. (Such an argument would have been notable: we are aware of no issue of fact to which an "absolute certainty" standard of proof applies. Even criminal convictions need not be proved to an absolute certainty.) Rather, as explained above, Brown's attorney argued that Davies's mistake of fact was unreasonable.

Judge Wood was never asked to consider (much less decide) the separate contention that, even if Davies reasonably suspected that the man in the cab was Wolters, Davies's level of knowledge failed to amount to "probable cause". For this reason, we conclude that this argument was not preserved for appeal.

At oral argument, Brown's appellate attorney raised one additional contention: she asserted that Judge Wood never actually found that Davies's mistake was reasonable—i.e., never found that Davies acted reasonably when he concluded that Wolters was the man he saw get into the cab.

It is true that Judge Wood never used these exact words. But when Judge Wood's remarks are read in the context of the argument to which he was responding (the argument that Davies's mistake was unreasonable), it is obvious that Judge Wood was explaining why he rejected this argument

and why he concluded, instead, that Davies had acted reasonably.

We further note that Brown's current argument (that Judge Wood made no such finding) is at odds with the content of Brown's opening brief. Brown's brief repeatedly adopts the view that Judge Wood did, in fact, rule that Davies's mistake was reasonable.

In Paragraph II of the "Issues Presented" section of the opening brief, Brown's appellate attorney frames the issue as whether Judge Wood erred "when [he] found that the [probation] officer had made a reasonable mistake in concluding that his [probationer] was in [the] vehicle[, given the fact that] the man in the vehicle [i.e., Brown] was a large black man [while] the person who was the target of the [probation] officer's interest [i.e., Wolters] was a small white man".

In the "Statement of the Case" section of the brief, Brown's attorney likewise declares that Judge Wood "found that the probation officer was mistaken that the individual in the cab was Mr. Wolters, but that the mistake was understandable given the [circumstances]".

And, finally, in Part II of the "Argument" section of the brief, Brown's appellate attorney states that "the trial court found that Mr. Davies's conclusion that it was Mr. Wolters in the cab, although mistaken, was nonetheless reasonable." Later in that same section, Brown's attorney declares that "[Judge Wood's] conclusion that Mr. Davies had been reasonable in his efforts to determine who was in the cab is wrong. [Davies's] actions were not reasonable."

In other words, to the extent that Brown now argues that Judge Wood never found that Davies acted reasonably when he mistook Brown for Wolters, this contention was raised for the first time at oral argument, and it is therefore waived.[10]

*Conclusion*

We have considered all of Brown's arguments, and we have concluded that they are

either meritless or unpreserved. Accordingly, the judgement of the superior court is AFFIRMED.

10. *Kellis v. Crites,* 20 P.3d 1112, 1114–15 (Alaska 2001); *Edwards v. State,* 34 P.3d 962, 969–970 (Alaska App.2001).