Andrew C. MOFFITT, Appellant,

v.

STATE of Alaska, Appellee.

No. A–9787.

Court of Appeals of Alaska.

May 22, 2009.

Marjorie Allard, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Ap-

peals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

MANNHEIMER, Judge.

In October 2005, Andrew C. Moffitt was facing felony charges in the Palmer superior court. On October 7th, he failed to appear for a scheduled court proceeding in that felony prosecution. Based on this conduct, he was indicted for felony failure to appear at a judicial proceeding.[1] Following a jury trial, Moffitt was found guilty of this offense.

A few days after the jury returned its verdict, Moffitt filed a motion asking the superior court to grant him a new trial. In this motion, Moffitt argued that the prosecutor's final argument to the jury, coupled with the trial judge's instructions to the jury and the trial judge's later response to a mid-deliberation question posed by the jury, created a substantial possibility that the jury convicted Moffitt even though they believed that his failure to appear might have been inadvertent.

The superior court denied Moffitt's motion for a new trial. For the reasons explained here, we conclude that Moffitt is correct: there is a substantial chance that the jury followed a mistaken view of the law when they found him guilty of failing to appear. We therefore conclude that the superior court abused its discretion when the court denied Moffitt's motion for a new trial.

*The culpable mental state that must be proved to establish a defendant's guilt of failure to appear*

Under AS 12.30.060, a defendant facing criminal charges commits the separate crime of failure to appear if the defendant "knowingly fails to appear before a court or judicial officer as required".

This Court has interpreted and explained the elements of this crime in two decisions:

*Hutchison v. State*, 27 P.3d 774 (Alaska App. 2001), and *Jackson v. State*, 85 P.3d 1042 (Alaska App.2004).

In *Hutchison*, we were called upon to construe the pre-September 2000 version of the statute, which defined the crime as "wilfully" failing to appear (as opposed to the current version, which penalizes "knowingly" failing to appear).[2] The defendant in *Hutchison* testified that, on the night before his scheduled omnibus hearing, he drank so much that he passed out and did not awaken until the next afternoon—thus missing his court appearance. Based on this testimony, the trial judge (who was hearing the case without a jury)[3] declared that he "ha[d] a reasonable doubt [whether] Mr. Hutchison's conscious goal was not to come to court that morning". *Id.* at 782. The question presented in Hutchison's appeal was whether this reasonable doubt concerning Hutchison's purpose (or, rather, his lack of conscious purpose) required the trial judge to acquit Hutchison.

We first surveyed the federal cases on this subject and concluded that, under federal law, a defendant's failure to appear at a judicial proceeding will constitute the crime of failure to appear only if the defendant's failure to appear was "purposeful" or "deliberate" or "intentional" (in the usual sense of this word, rather than under the technical definition of "intentional" codified in AS 11.81.900(a)(1)). *Id.* at 777. In other words, "even though a defendant may have failed to appear as required, the defendant will not have acted [with the culpable mental state required for conviction] if the failure to appear was the result of mistake or inadvertence or good-faith but feckless efforts." *Id.*

We then examined Alaska case law on a related subject—contempt of a court order—and concluded that the Alaska law of contempt required proof of essentially the same culpable mental state. *Id.* at 779–780. We noted, in particular, what the Alaska Supreme Court said in *Continental Insurance Companies v. Bayless & Roberts, Inc.*, 548 P.2d 398, 407 (Alaska 1976): for purposes of

---

**1.** AS 12.30.060(1).

**2.** *Hutchison*, 27 P.3d at 775–76.

**3.** *Id.* at 776.

adjudicating a charge of criminal contempt, "[a] willful failure to comply with [a court] order occurs when [the] failure is ... due ... to purposefulness, bad faith[,] or fault of [the] petitioner as distinguished from accidental, inadvertent[,] or negligent conduct."

Having surveyed these two lines of cases, we concluded in *Hutchison* that the crime of failure to appear codified in AS 12.30.060 requires proof of this same culpable mental state:

> [A] defendant willfully fails to appear if, in the absence of some legally recognized justification or excuse, the defendant makes a deliberate decision to disobey a known obligation to appear in court (including instances of "willful blindness", where the defendant engages in conduct designed to avoid notice of the court date).... [T]he government need not prove that the defendant acted with the conscious aim or purpose of causing a particular result[, but] the government must prove ... that the defendant's purpose was to disobey or disregard the court's order to appear.

*Hutchison,* 27 P.3d at 780.

Having construed the statute in this manner, we concluded that the trial judge should have acquitted Hutchison of failing to appear:

> Based on [Hutchison's] testimony, [the trial judge] declared that he "ha[d] a reasonable doubt [whether] Mr. Hutchison's conscious goal was not to come to court that morning". If Hutchison did not act with the conscious purpose of avoiding his obligation to appear, he did not act "wilfully".... Therefore, based on [the trial judge's] evaluation of the evidence, Hutchison should have been acquitted.

*Hutchison,* 27 P.3d at 782.

As noted above, our decision in *Hutchison* dealt with the pre-September 2000 version of the failure to appear statute. This former version of the statute defined the offense in terms of "willfully" failing to appear, whereas the current version of the statute defines the offense in terms of "knowingly" failing to appear. But as we explained in *Hutchison,* given the definition of "knowingly" codified in

AS 11.81.–900(a)(2), the concept of "willfully" failing to appear is essentially the same as the concept of "knowingly" failing to appear—with the exception that there is a special clause in the definition of "knowingly" which provides that voluntary intoxication does not negate this culpable mental state.[4]

■ Thus, our decision in *Hutchison* established the rule that, to prove a "knowing" failure to appear, the State must prove that the defendant made a deliberate, conscious decision not to come to court. The crime is not proved if the defendant's failure to attend the judicial proceeding was a result of mistake, inadvertence, or even negligence.

Three years after *Hutchison,* we applied this same definition of "knowingly" in our next decision dealing with the failure to appear statute, *Jackson v. State,* 85 P.3d 1042 (Alaska App.2004).

The precise issue presented in *Jackson* was whether the State was required to prove that the defendant's conscious decision not to appear in court was made on the very day, and at the very time, of the defendant's scheduled court appearance. In other words, was the State required to prove that the defendant was consciously thinking about the obligation to appear in court, and consciously deciding not to go to court, at the very time of their court date? *Id.* at 1043. We held that this was not required:

> Jackson would be guilty of "knowingly" failing to appear if he decided early on that he would not attend his scheduled court appearances, and he then dismissed the matter from his mind. Jackson's conscious decision not to attend court, combined with his subsequent failure to appear on the two specified days, would constitute a sufficient concurrence of culpable mental state and prohibited act or omission—even if it were true that, on the two scheduled days, Jackson gave no conscious thought to his court appearances.

*Jackson,* 85 P.3d at 1043–44.

But for present purposes, the important part of our decision in *Jackson* is our reiteration of what we said earlier, in *Hutchison,*

4. *Hutchison,* 27 P.3d at 780.

regarding what constitutes a "knowing" failure to appear: The State is required to prove that, at some point before the scheduled court appearance, the defendant made a conscious decision not to go to court—that the defendant's failure to appear in court was not the result of mistake, inadvertence, or negligence. Here is our discussion of this point in *Jackson:*

> Jackson also argues that the jury may have convicted him based solely on the undisputed evidence that he was informed (at his arraignment) of his two future court dates [and that he thereafter failed to appear]. But we do not read the jury instructions to allow this.
>
> As explained above, the jury was told that Jackson could not be convicted unless the jurors were convinced beyond a reasonable doubt that Jackson's conduct (*i.e.,* his failure to appear) was knowing, and they were further told that Jackson could not be convicted unless the jurors found a "joint operation" of culpable mental state and prohibited conduct. Jackson presented the defense that he made an honest mistake as to the date of his first scheduled court appearance and that, after he realized that he had missed this first court appearance, he honestly believed that his second court appearance would be canceled and that he would be notified of new court dates. If the jury had accepted these assertions, they would not have found that Jackson's [failure to appear] was "knowing" as defined in the instructions.

*Jackson,* 85 P.3d at 1044.

In other words, both *Hutchison* and *Jackson* hold that the State is required to prove that the defendant made a deliberate, conscious decision not to attend court—and that an honest mistake about the date or time of the court hearing is a defense to the charge of failure to appear.

*The evidence presented at Moffitt's trial, the summations of the parties, the mid-deliberation proceedings, and Moffitt's motion for a new trial*

The ultimate question to be decided at Moffitt's trial was whether Moffitt knowingly failed to appear for his scheduled court appearance at 10:00 a.m. on October 7, 2005. The State's case consisted entirely of evidence that Moffitt was apprised of this court date, and that he thereafter failed to appear.

In the prosecutor's opening statement, he told the jury that the State would present evidence that Moffitt was clearly informed of his October 7, 2005 court date, "that Mr. Moffitt was not present [for that court appearance]", and "that [his] not being present then made him culpable". The prosecutor then added:

> This [case] will be very straightforward: ... There was a [court] date. The date was given [to Moffitt, as evidenced by his] signatures.... He was told. He doesn't show up. And that's the State's case.

When Moffitt's attorney responded with the defense opening statement, the defense attorney conceded that Moffitt missed his October 7th court appearance. But the defense attorney described how Moffitt called the court later that day and made several efforts to contact his attorney. The defense attorney told the jury that the case hinged on whether Moffitt acted "knowingly" when he missed the court appearance.

In the State's case-in-chief, the prosecutor presented the testimony of two in-court clerks. The first in-court clerk, Rachel Rodriguez, testified that she was present in court when Moffitt was informed about the October 7th court date. The second in-court clerk, Mary King, testified that she was present in court on the morning of October 7th when Moffitt's case was called; Moffitt did not appear—and, as a consequence, the court issued a bench warrant for his arrest.

The prosecutor also presented the testimony of a corrections officer, Christine Jimenez, who testified that she was present when Moffitt was released from jail (on bail) on the afternoon of October 2, 2005, and that she heard Moffitt's bail bondsman explaining to Moffitt that he had a court appearance scheduled for October 7th.

The State also called Moffitt's bail bondsman, John Chapman. Chapman conceded that he did not specifically remember writing the bond for Moffitt, nor did he remember his conversation with Moffitt at that time.

However, Chapman testified that whenever he writes a bail bond for a defendant, he informs the defendant of their next court date (as well as any other court dates that are listed in the defendant's paperwork). In Moffitt's case, the paperwork showed that Moffitt had a court appearance scheduled for October 7, 2005 at 10:00 a.m.

The State's final witness was Assistant Public Defender Elizabeth Varela. Varela testified that the Public Defender Agency was initially appointed to represent Moffitt in the underlying felony case (3PA–05–2706 Cr), but that the Agency had a conflict and was permitted to withdraw on October 7, 2005 (*i.e.*, the date of Moffitt's missed court appearance). Varela testified that she was present in court on that date, and that Moffitt was not present.

Following Varela's testimony, the prosecutor announced that the State rested.

The majority of the defense case consisted of the testimony given by Moffitt and his friend, Alicia Hensel.

Moffitt testified that he was released from jail on October 2nd, and that he faithfully attended his court appearance on October 5th. With regard to the court appearance that he missed two days later, on October 7th, Moffitt explained that he was "messing around the house", and that in the mid-afternoon he happened to look at his court paperwork again and saw that he had another appearance scheduled for that day.

Moffitt initially read the paperwork as saying that his court appearance was at 2:30 p.m.—which gave him barely enough time to get to the courthouse, so he called the court to say that he might be a few minutes late. But the clerk who answered Moffitt's call told him, "You're ... more than a couple minutes late; you're four hours late." When Moffitt asked the clerk what he should do, the clerk answered, "You've got a bench warrant; there's nothing you can do." The clerk then told him, "Call your lawyer."

Moffitt asked the clerk to tell him who his lawyer was. The clerk said that she did not know, but she advised Moffitt to contact the Public Defender Agency. Moffitt called the Public Defender, but they told him that they had stopped representing him earlier that day, and they advised him to call the Office of Public Advocacy. When Moffitt contacted the Office of Public Advocacy, they told him that John Pharr was his contract lawyer. So Moffitt next called Pharr's office—but no one answered.

Moffitt's account of these events was corroborated by the testimony of Alicia Hensel. Hensel testified that Moffitt was staying with her following his release from jail on October 2nd. Hensel further testified that, on the afternoon of October 7th, Moffitt was getting ready to go to court when "he looked at his paperwork and panicked because the ... time was different than what he thought". According to Hensel, Moffitt then made several phone calls, "trying to ... get it taken care of, so he didn't get in trouble.... He wanted to ... fix any problem right away."

Following Hensel's testimony, both sides rested.

The opening portion of the prosecutor's summation to the jury was unobjectionable—although the prosecutor did mischaracterize the nature of Moffitt's defense. The prosecutor told the jury that Moffitt's defense was, "that he forgot, misunderstood, didn't sign the documents, didn't know what he was signing, didn't get the paperwork". The prosecutor then declared that all of this was "a little hard to believe".

The prosecutor pointed out that Moffitt undisputedly received notice of the October 7th court date. The prosecutor then argued that this court date was so important that Moffitt was unlikely to have forgotten it: "This [was]n't traffic court. This [was]n't a dog bite case. This [was] a felony matter." The prosecutor then added:

> I could maybe buy [Moffitt's] argument [if] he shows up the next day [or] later on in the afternoon [saying], "Oh, wait. Don't put that bench warrant out. I'm here; I'm here.... Please let me do something [to remedy the situation]." But as we see, on [October] 11th he still isn't here, because ... a bench warrant [is issued that day]. Okay? So [on] the 11th, he still isn't here. [That's] five days.

In other words, the prosecutor argued that the jury should not believe Moffitt's assertion that he innocently forgot about the court date, because this assertion was belied by Moffitt's behavior *after* he missed the court date—in particular, Moffitt's failure to take any action to rectify matters.

This argument was entirely proper. And if the prosecutor had confined his argument to the assertion that Moffitt's behavior after October 7th was circumstantial evidence that Moffitt acted "knowingly"—circumstantial evidence that Moffitt made a deliberate, conscious decision not to come to court—then there would be no problem in this case.

But after the prosecutor sat down, Moffitt's defense attorney directly attacked the State's assertion that Moffitt acted "knowingly" when he missed the court date. The defense attorney argued that, given Moffitt's and Hensel's testimony—*i.e.*, the testimony that Moffitt made an innocent mistake about the court date, and that Moffitt then engaged in frantic efforts to take care of the problem that same afternoon—the State had failed to prove beyond a reasonable doubt that Moffitt acted "knowingly" when he failed to appear for the October 7th court date.

The defense attorney read the legal definition of "knowingly" to the jury, and then he said:

Now, that's kind of a round-about way of saying, "What was on [Moffitt's] mind on the morning of October 7, 2005?" Was he aware that he [was] missing a court date? Is he saying, "Oh, it's ten o'clock. I don't really feel like going to court. To heck with it. I'm not going to court—don't feel like it." Is that the way the testimony came out? Of course not.

The defense attorney conceded that, after Moffitt learned that he had missed his court appearance and that a bench warrant had been issued for his arrest, Moffitt did not do the honorable thing and surrender himself. Instead, Moffitt tried to avoid arrest—and, when he was later arrested, he gave a false name. (He identified himself as Hensel's brother.) But the defense attorney urged the jury not to convict Moffitt just because he showed human weakness and did not want

to go back to jail for innocently missing the court date.

The defense attorney then concluded:

The State never put on any evidence of why [Moffitt] didn't appear. [The State has] tried to draw some inferences from what he did later, ... but I think what he did later is as rational as what anybody would do. I mean, we've got 15 people in [this] room; you would see 15 'different reactions to that situation. And Mr. Moffitt is well within the range of what anybody would do in that situation.

So, ladies and gentlemen, ... the State has not proven its case, and we'd ask for an acquittal.

The problem in this case arises from the fact that, after the defense attorney sat down, the prosecutor (in rebuttal) began to misstate the law relating to the culpable mental state that the State had to prove. In essence, the prosecutor told the jurors that it did not matter if Moffitt had innocently forgotten about his court appearance, or if he had made a mistake about the scheduled hour of that appearance. The prosecutor suggested that, under the legal definition of "knowingly", all the State had to prove was that Moffitt received notice of the date and time of his court appearance—and that even if Moffitt honestly forgot about the appearance or made a mistake about the time, "[that] doesn't ... negat[e] the fact that he did know":

[The defense attorney's contention about Moffitt's] rationality, his mental state on the day of [the court appearance], is [a] mischaracterization of the law....

When you read through the "knowingly" instruction that you'[ve been] given, you're going to see that [Moffitt] has to have knowledge of the existence of a particular fact. [This] fact is that he had a court date. That knowledge is established if a person is aware of [a] substantial probability of the existence of that fact. [Moffitt] admitted it. He knew it. It's not, "Hey, I overslept, and therefore I can't be held accountable", or "I'm hung over", or "I was with some girl", or whatever excuse you come up with, and [then] you get to count

that as "Oh, I didn't know". He *did* know—and you don't get to do that.

And ... you don't have to worry about his mental state on [the day of the court appearance], at that very moment. "Well, I didn't mean to miss it", or "I didn't know", or "I forgot"—that doesn't count for negating the fact that he did know. And you'll get that instruction.... [I]t's not an easy instruction [to understand], okay? And I'm not ... discounting your intelligence, but take it and read the "knowingly" [definition]. It'll be very clear to you. [Moffitt] knew. The State proved that he knew.

The prosecutor then addressed the defense evidence pertaining to the telephone calls that Moffitt purportedly made on the afternoon of October 7th, after he realized that he had missed his court appearance and that a bench warrant had been issued for his arrest:

[Y]ou know what? This doesn't matter. It doesn't matter.... [That evidence] doesn't say, "I hereby give Mr. Moffitt a free pass for not showing up to court." ... This isn't a free pass. This isn't a note from Mom that says, "Yeah, the dog ate my homework; please excuse me." That doesn't work, okay?

...

Ladies and gentlemen, ... [t]ake a look at the documents. You have the facts.... Did he know he had a [court] date, an appointment with a superior court judge in a felony matter? And did he miss it? No excuses. Did he miss it? The answer is, "Yes, he missed it." He missed it, and he lied to the cops about his name [when they came to arrest him] because he didn't want to get caught. That's his mental state. He knew. He was avoiding the consequences. And he's guilty. Thank you.

The problem with the prosecutor's rebuttal argument is that, depending on how these remarks are read, the prosecutor either strongly suggested or else directly asserted that the jury could properly convict Moffitt even if the jury believed that Moffitt had innocently or negligently forgotten about, or mis-remembered, the date or time of his court appearance. The prosecutor essentially told the jury that, under the applicable definition of "knowingly", it was sufficient for the State to prove (1) that Moffitt knew about the scheduled court date and (2) that Moffitt failed to attend court on the scheduled date and time—even if the State failed to prove that Moffitt made a deliberate, conscious decision not to come to court.

Thus, the defense attorney and the prosecutor offered the jury two competing views of what constitutes a "knowing" failure to appear. The defense attorney argued (consistent with our decisions in *Hutchison* and *Jackson*) that, to prove a "knowing" failure to appear, the State was required to prove that Moffitt's failure to appear was not the result of an innocent or negligent mistake, but rather the result of a deliberate, conscious decision. The prosecutor, on the other hand, argued in rebuttal that a "knowing" failure to appear meant that Moffitt knew about the court date and then failed to appear—regardless of whatever excuse Moffitt might offer: "Did he know he had a [court] date, an appointment with a superior court judge in a felony matter? And did he miss it? No excuses. Did he miss it? The answer is, 'Yes, he missed it.'"

This problem was exacerbated by Jury Instruction No. 5, the jury instruction on the definition of "knowingly". At first blush, our assertion that Jury Instruction No. 5 made things worse may seem paradoxical—because the instruction defined the concept of "knowingly" using language that faithfully tracked the statutory definition of "knowingly" codified in AS 11.81.900(a)(2). Jury Instruction No. 5 stated:

A person acts "knowingly" with respect to conduct or to a circumstance described by the law when the person is aware that the conduct is of that nature. When knowledge of the existence of a particular fact must be proved by the state, that knowledge is established if a person is aware of a substantial probability of the existence of the fact, unless the person actually believes that it does not exist.

(The one significant departure from the statutory definition of "knowingly" occurs at the end of the first sentence of this jury instruction. The statutory definition con-

tains the additional italicized language: "... when the person is aware that the conduct is of that nature *or that the circumstance exists*.")

Despite the fact that Jury Instruction No. 5 tracked the language of the statutory definition of "knowingly", the wording of the instruction was crucially ambiguous in the context of Moffitt's case. This is because, under the Alaska Criminal Code, the culpable mental state of "knowingly" describes two concepts.

■ With respect to conduct, the word "knowingly" means that a person acted with awareness of the nature of their conduct. With respect to surrounding circumstances, the word "knowingly" means that a person was aware that the circumstance existed, or was aware of a substantial probability that the circumstance existed (unless the person actually believed that, despite this probability, the circumstance did not in fact exist).

In Moffitt's case, there was no dispute concerning his awareness of the circumstance that he had a court appearance scheduled for the morning of October 7, 2005. Moffitt affirmatively conceded that he was notified of this court appearance. The sole dispute at Moffitt's trial was whether his *conduct*—his failure to attend that scheduled court date— was "knowing". Moffitt argued that his failure to attend the court hearing was the result of an innocent or negligent mistake rather than a deliberate, conscious decision not to attend. Under our decisions in *Hutchison* and *Jackson,* this was a valid defense— even though the prosecutor, in his rebuttal argument, suggested that this was not a defense.

The problem with Jury Instruction No. 5 is that the majority of the instruction (the instruction's lengthy second sentence) focused on Moffitt's knowledge of the surrounding circumstances. As we have just explained, this was a non-issue in Moffitt's case; he conceded his awareness of the operative fact that he had a court date on October 7th.

But because of the way the prosecutor argued Moffitt's case in rebuttal, this otherwise irrelevant portion of the instruction became important—because it could be viewed as supporting the prosecutor's mistaken argument that Moffitt's knowledge of the scheduled court date, coupled with Moffitt's ensuing failure to attend court on that date, was sufficient to establish that he acted "knowingly".

This problem—the contextual ambiguity of Jury Instruction No. 5—was brought to the attention of the trial judge and the parties when, during the jury's deliberations, the jury sent the following note to the judge:

> Does knowingly mean knowledge of the court date or does knowingly mean he was unaware of the date of the appearance *on* the day of the appearance[?]
>
> Is knowingly similar to premeditation?
>
> We have different interpretations of instruction # 5.

(The underlining is present in the original.)

Looking back on this jury inquiry in hindsight, it appears that the jury's second question—"Is 'knowingly' similar to premeditation?"—went to the very heart of the matter.

True, as a matter of technical law, the concept of "premeditation" had nothing to do with Moffitt's guilt or innocence. But it was not legal technicians who were asking the question. Rather, the question was posed by lay people, and they wanted to know whether the concept of "knowingly" was *similar to* (not precisely the same as) the concept of premeditation. Given the circumstances, it appears that the jurors were asking the same question that this Court addressed (and answered) in *Hutchison* and *Jackson.* A straightforward answer to the jurors' question would have been: To prove that Moffitt "knowingly" failed to appear, the State was required to prove that, at some point prior to his scheduled court appearance, Moffitt made a deliberate, conscious decision not to come to court.

But instead of directly answering the jurors' question, the trial judge decided to reissue Jury Instruction No. 5—this time inserting the language that the judge had earlier omitted at the end of the first sentence: "... when the person is aware that the conduct is of that nature *or that the circumstance exists*." Moreover, the judge told the attorneys that he intended to read this itali-

cized language to the jury in a manner that highlighted this change. Given the situation, this supplemental wording only heightened the ambiguity of the instruction and increased the possibility that the jury would follow an erroneous legal theory when assessing Moffitt's guilt or innocence.

Moffitt's attorney immediately objected to the trial judge's proposed action. The defense attorney protested that "the way the Court has written it, [the revised instruction] virtually guarantees conviction". The defense attorney's objection prompted the following colloquy:

> *Defense Attorney:* [The prosecutor] argued [to the jury] that it didn't matter what [Moffitt] thought on the day in question—[that] what mattered was that he was given notice of the [court appearance] four days before. . . .
>
> . . .
>
> *Prosecutor:* [To justify a conviction, Moffitt] needs to know that there is a court date, and the nature [of his conduct] is that he was [required] to appear. I think this description [of the law] is accurate. [Moffitt] doesn't have to have one happening simultaneous. [*sic*] He has to know that he has a court date, and he has to not appear. That's it.

To resolve this conflict, the trial judge suggested that the jury also receive a second supplemental instruction—this one on the law's requirement of a joint operation of unlawful conduct and culpable mental state:

> For the crime I have instructed you on[,] there must exist a joint operation of an act or conduct and a culpable mental state. To constitute a culpable mental state[,] it is not necessary that there exists an intent to violate the law. When a person knowingly does that which the law declares to be a crime, he is acting with a culpable mental state, even though he may not know that his action or conduct is unlawful.

Although the defense attorney announced at the time that he was satisfied with this additional instruction, this additional instruction just made things worse. The last two sentences of this instruction appear to fully support the prosecutor's argument that it did

not matter whether Moffitt ever made a deliberate, conscious decision not to attend his court hearing.

Thirty minutes after the court sent these two supplemental instructions to the jury (the revised version of Instruction No. 5 and the new instruction we just quoted), the jurors returned to court and announced that they had found Moffitt guilty of failure to appear.

A few days later, Moffitt's attorney filed a motion for a new trial. In that motion, the defense attorney clearly identified the problem with the prosecutor's rebuttal summation to the jury. The defense attorney pointed out that the prosecutor had, in violation of this Court's decision in *Jackson*, "argued that Mr. Moffitt's asserted defense [*i.e.*, honest mistake or negligent failure to remember] was legally irrelevant so long as the jurors found that Mr. Moffitt had received advance notice of the . . . court dates."

In its response to Moffitt's motion for a new trial, the State did not argue that the prosecutor's statement of the law was correct. Rather, the State argued only that it was too late for Moffitt to object to the prosecutor's argument—that Moffitt had waived this claim of error by failing to raise a contemporaneous objection to the prosecutor's rebuttal. The State also noted that the court's instructions to the jury regarding the issue of culpable mental state were correct statements of the law.

The superior court denied Moffitt's motion for a new trial in a written order. In that order, the trial judge stated that he had reviewed the audio record of the prosecutor's rebuttal summation, and he disagreed with the defense attorney's characterization of the prosecutor's argument. The trial judge conceded that "at one point the prosecutor said something which could be interpreted the way defense counsel describes it", but the trial judge concluded that the prosecutor's remarks "could also be interpreted in other ways". The judge then declared that the prosecutor's argument "does not appear to be a clear argument that the 'guilty act and guilty mind' do not need to coincide as discussed in *Jackson v. State*". The judge concluded by stating, "[T]he prosecutor's ar-

gument was at most somewhat confusing. [There was] no prosecutorial misconduct, much less plain error justifying a new trial."

*Why we conclude that the superior court should have granted Moffitt's motion for a new trial*

■ Alaska Criminal Rule 33(a) authorizes the superior court to grant a new trial to a defendant if a new trial is required in the interest of justice. When an appellate court reviews a trial court's decision to grant or deny a motion for a new trial, we employ an abuse of discretion standard of review.[5]

■ We conclude that an abuse of discretion occurred here because the record of Moffitt's trial reveals a substantial possibility that the jury convicted Moffitt under an incorrect legal theory. Specifically, there is a substantial chance that the jurors voted to convict Moffitt even though they thought there was a reasonable possibility that Moffitt missed his October 7th court appearance because of an innocent mistake, or because of negligence, rather than as a result of a deliberate, conscious decision not to attend court.

We disagree with the trial judge's interpretation of the prosecutor's summation to the jury. The prosecutor did not simply make an isolated ambiguous statement that might have been interpreted the wrong way. Instead, during the rebuttal portion of his summation, the prosecutor responded to Moffitt's asserted defense (honest or negligent mistake) by telling the jury that Moffitt's "excuses" made no difference—that Moffitt acted "knowingly" within the meaning of the jury instructions if Moffitt received notification of his October 7th court appearance and if he subsequently failed to come to court.

The jury's mid-deliberation questions confirm that they understood the prosecutor to be arguing this, and that they wanted the court to help them decide whether the prosecutor's argument was consistent with the law—specifically, consistent with the definition of "knowingly" contained in Jury Instruction No. 5.

It is true, as the State pointed out in its opposition to Moffitt's motion for a new trial, and as the superior court pointed out in its order denying the new trial, that all of the court's instructions to the jury were, technically speaking, correct statements of the law. But despite the technical correctness of these instructions, there is a substantial chance that they misled the jury in the specific context of this case.

The jury was asking whether Moffitt's offered defense was, in fact, a valid defense to the charge—or whether, as the prosecutor argued during his summation, this offered defense was irrelevant. The revised version of Instruction No. 5 that the court offered in response to the jury's questions only heightened the ambiguity of the original version of the instruction. And the supplemental instruction dealing with the interaction of conduct and culpable mental state (although, again, technically correct) was worded in such a way as to suggest that the prosecutor's erroneous view of the law was in fact correct.

We note, in particular, the final two sentences of the supplemental instruction (Instruction No. 19), which stated in part: "it is not necessary that there exist[ ] an intent to violate the law", and that "[w]hen a person knowingly does that which the law declares to be a crime, he is acting with a culpable mental state, even though he may not know that his action or conduct is unlawful." Trained lawyers would understand that these pronouncements were basically irrelevant to the question that the jurors had posed. But the jurors in Moffitt's case might easily have seized on these statements as constituting the court's answer to their questions about the validity of Moffitt's asserted defense—and they could have construed these statements as a judicial pronouncement that Moffitt's asserted defense was no defense at all.

Moffitt's case presents a situation where one or two sentences of plain English would have served far better than the several paragraphs of technically accurate—but misleading—legal principles that the jury received. The answer to the jury's underlying question is supplied by our decisions in *Hutchison* and

---

**5.** *Nygren v. State,* 616 P.2d 20, 22 (Alaska 1980); *Salinas v. State,* 373 P.2d 512, 513 (Alaska 1962).

*Jackson:* A person is guilty of "knowingly" failing to appear if they fail to attend their court proceeding as a result of a deliberate, conscious decision not to come to court—if they act with "the conscious purpose of avoiding [the] obligation to appear". *Hutchison,* 27 P.3d at 782. A person is not guilty if their failure to appear is the result of mistake, inadvertence, or negligence.

Because the record reveals a significant possibility that the jurors misunderstood this crucial principle of law, and that they convicted Moffitt in violation of this principle, we REVERSE the judgement of the superior court. Moffitt is entitled to a new trial.