NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| CON LYSLE COMPTON,<br><br>                    Appellant,<br><br>          v.<br><br>STATE OF ALASKA,<br><br>                    Appellee. | Court of Appeals No. A-13940<br>Trial Court No. 4FA-19-00187 CR<br><br>O P I N I O N<br><br>No. 2818 — October 10, 2025 |

Appeal from the Superior Court, Fourth Judicial District, Fairbanks, Thomas I. Temple, Judge.

Appearances: Kelly R. Taylor, Assistant Public Defender, and Terrence Haas, Public Defender, Anchorage, for the Appellant. Madison M. Mitchell, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Terrell, Judges.

Judge ALLARD, writing for the Court.
Judge TERRELL, concurring in part and dissenting in part.

A jury found Con Lysle Compton guilty of multiple counts of sexual assault of K.H. The jury also found Compton guilty of multiple counts of sexual abuse of a minor for the same conduct, under the theory that he occupied a position of

authority in relation to K.H., who was sixteen years old at the time and whom he had hired to babysit his children. The superior court merged the sexual abuse of a minor counts into the sexual assault counts, and entered one conviction for first-degree sexual assault and two convictions for second-degree sexual assault.[1]

On appeal, Compton challenges the jury's guilty verdicts on the merged sexual abuse of a minor counts on two separate grounds. As a threshold matter, the State argues that these claims are moot because the sexual abuse of a minor counts merged into the sexual assault counts. We disagree that the claims are moot. Although the State is correct that convictions were not entered on the sexual abuse of a minor counts, we conclude that Compton may nevertheless challenge these guilty verdicts because of the possibility of collateral consequences from those verdicts in his particular case.

Compton's first challenge to the sexual abuse of a minor guilty verdicts is that there was insufficient evidence for the jury to find that he occupied a position of authority in relation to K.H. For the reasons explained here, we conclude that there was sufficient evidence for a reasonable juror to find that Compton occupied a position of authority in relation to K.H., and we therefore reject this claim.

Compton's second challenge relates to the jury instructions for the sexual abuse of a minor charges. Compton argues that the culpable mental state of "recklessly" applies to the "position of authority" element, and that the failure of the superior court to instruct the jury on this culpable mental state requires reversal of the guilty verdicts for sexual abuse of a minor. Because Compton did not contest this issue in the superior court, he must show plain error. We agree with Compton that the mental state of "recklessly" applies to the "position of authority" element at least when the existence of that circumstance separates non-criminal conduct from criminal conduct. We do not agree, however, that the failure to instruct the jury on this *mens rea* constitutes plain

---

[1]  Former AS 11.41.410(a)(1) (2018) and former AS 11.41.420(a)(1) (2018), respectively.

error in this particular case given that Compton never disputed at trial that he was in a position of authority in relation to K.H. and never argued that he was unaware of his position of authority as K.H.'s employer.

Compton also argues, with regard to all of his guilty verdicts, that the superior court erred in how it answered a jury question. We see no error in the court's response to the jury question, and we therefore affirm Compton's sexual assault convictions.

Finally, Compton challenges a probation condition that requires him to submit to suspicionless searches for sexually explicit material. He primarily argues that the Alaska Constitution requires a probation officer to have reasonable suspicion in order to search a probationer. We reject this argument and conclude that there is no categorical bar on a court imposing probation conditions that authorize suspicionless searches. We agree with Compton, however, that, as part of the special scrutiny analysis in this case, the trial court was required to affirmatively consider whether to impose a reasonable suspicion requirement for those searches that directly implicate Compton's privacy rights in his home and personal electronic devices. Accordingly, we remand the search condition to the superior court to subject the condition to special scrutiny and determine whether a suspicionless search is the least restrictive alternative under the circumstances of this case.

*Underlying facts and proceedings*

Compton and K.H. met on a dating app. K.H. was sixteen years old but represented her age on her profile as eighteen. Compton was thirty-three years old and married, but he occasionally invited people to have sex with him or to be introduced to his wife.

Compton messaged K.H. on the dating app, asking if she was really eighteen. K.H. responded that she was sixteen, and Compton later commented that she had "daddy issues." The messages turned into a discussion about K.H. babysitting

Compton's five children. They decided to move the conversation to Facebook to discuss babysitting.

Compton initially asked K.H. to babysit his children while he and his wife went out to dinner. But after the pipes in their home froze, they canceled these dinner plans, and Compton then asked K.H. to babysit the children overnight while he, his wife, and their roommate fixed the pipes on the property. Compton told his wife that he found K.H. on a babysitting website, and K.H. told her grandmother that she had advertised babysitting services on Facebook.

K.H.'s grandmother talked to Compton before driving K.H. to the home to babysit. Once there, she met with Compton, his wife, and the children before agreeing to leave K.H. overnight to babysit. K.H.'s grandmother provided Compton and his wife with medication that she said K.H. was required to take.

K.H. testified that she expected to be a babysitter; she did not expect anything more from her relationship with Compton. She testified that, right after she arrived, she helped Compton and his wife finish making their bed. She then ate dinner with the family and watched a movie. Compton's wife testified that she set up K.H. and the youngest child in the Comptons' bedroom with a movie. Compton, his wife, and their roommate started working on the pipes around 11:45 p.m. and worked until around 2:00 a.m. After K.H. put the children to bed, the three adults joined her in the bedroom. They all watched part of a movie before Compton's wife fell asleep and the Comptons' roommate left the room.

K.H. testified that Compton then asked her if she "wanted to see something dirty," typing the message out on his phone and showing her his phone screen. He showed her explicit sexual pictures of him and his wife and told K.H. that was "the reason why the bed needed [to be] cleaned."

According to K.H., she then went outside to smoke a cigarette. When she came back inside, Compton showed her where she was going to sleep, and she sat on the bed. Compton told K.H. that he wanted her to "have his kids." Compton told K.H.

that he and his wife were going through a divorce and "they had a third party at some point before and . . . it didn't go well." Compton asked K.H. to take photos of herself to show his wife and make her jealous.

K.H. testified that Compton asked her to scoot over, and she did. Once Compton sat down, he talked about K.H.'s boyfriend, saying that he "[was not] a man because he [did not] grab [her] the way a man should." K.H. testified that Compton then "very aggressively" grabbed her thigh and said, "That's how a man should grab their girlfriend."

K.H. testified that Compton touched her breast under her shirt and bra despite her telling him no. He then grabbed her hand and put it on his erect penis over his clothing and told her that she "wouldn't be able to handle it." According to K.H., Compton pushed her back and touched her genitals over her leggings and "penetrated with his finger through [her] leggings," despite her repeatedly saying no. K.H. prevented Compton from putting his hands under her leggings by holding her arms across her waist.

K.H. testified that Compton then told her that she needed to take her medication. As she walked over to get it, he remarked that she "had a mom's ass." As she was taking her medication, Compton touched her butt. She then went to bed, and Compton went to his bed. K.H. testified that she eventually fell asleep, despite being "really scared" to do so.

K.H. testified that she woke up around 5:00 p.m., and Compton's roommate drove her home with Compton also in the vehicle. K.H.'s sister testified that when K.H. came home after babysitting at Compton's house, K.H. "was acting really strange." K.H.'s grandmother similarly testified that K.H. was acting standoffish.

K.H.'s grandmother testified that, a few days later, she drove K.H. back to Compton's house to pick up the money owed to her for babysitting. K.H. did not want to get out of the car or talk to Compton or his wife. They handed K.H.'s grandmother the money through the driver's window and asked if K.H. would babysit

again, which K.H. vehemently declined. K.H.'s younger sister, who was fourteen years old and was sitting in the backseat, offered to babysit.

K.H. testified that, a few days later, Compton called K.H.'s grandmother and asked if one of her granddaughters could babysit. After this call, K.H. told her sister about what had happened, and her sister encouraged her to call the police.

The police conducted an investigation, during which they had K.H. message Compton and ask if he needed a babysitter again. She said in the message that she could stay overnight and apologized for her "reaction last time," saying he had "surprised" her. K.H. said that she had "practiced taking a few pictures like [he] wanted [her] to" but deleted them. Compton replied that she "mistook something [he] said" but that he could clarify later. Compton asked her if she was available that day, and K.H. said, "You don't want pictures of me?" Compton replied, "Not what I said."

The police interviewed Compton, who admitted to meeting K.H. on an "adult website" before offering her a babysitting job. Compton denied showing explicit photos of himself and his wife to K.H., saying that K.H. must have seen them over his shoulder when he scrolled through pictures on his phone. He said that K.H. came onto him but that he told her to wait until she was older. He initially denied any sexual contact occurred, but later said that K.H. "groped his dick."

Compton was charged with one count of first-degree sexual assault, one count of second-degree sexual abuse of a minor for digital penetration, and three counts each of second-degree sexual assault and fourth-degree sexual abuse of a minor for touching K.H.'s breast and genitals and placing her hand on his genitals.[2] The sexual abuse of a minor charges were based on the theory that Compton was in a position of authority in relation to K.H.

---

[2] Former AS 11.41.410(a)(1) (2018), AS 11.41.436(a)(6), former AS 11.41.420(a)(1) (2018), and AS 11.41.440(a)(2), respectively.

Compton's defense at trial was that no sexual penetration or contact occurred, with the exception of when K.H. touched his genitals, which Compton testified she initiated and he stopped. Compton also testified that he viewed K.H. solely as a babysitter to his children. Neither Compton nor his attorney ever argued that Compton was not in a "position of authority" in relation to K.H.

The jury found Compton guilty on all counts. The superior court merged the sexual abuse of a minor counts into the sexual assault counts and entered convictions for one count of first-degree sexual assault (for digital penetration) and two counts of second-degree sexual assault (for touching K.H.'s breast and placing her hand on his genitals).

*Compton's challenges to the guilty verdicts on the sexual abuse of a minor counts*

*(1) Compton's challenges are subject to appellate review because of the possibility of collateral consequences*

As we have explained, Compton raises two challenges to the jury's verdicts that he engaged in sexual abuse of a minor: (1) that there was insufficient evidence to support the verdicts because he did not occupy a position of authority in relation to K.H., and (2) that the court failed to instruct the jury that a culpable mental state of "recklessly" applies to the "occupies a position of authority" element. As a threshold matter, the State points out that convictions were not entered for the sexual abuse of a minor counts because each of these counts merged into the sexual assault convictions. The State argues that this merger renders any challenges to the guilty verdicts for the sexual abuse of a minor counts moot, citing our unpublished decision in *Fowlkes v. State*.[3] We disagree with the State that *Fowlkes* compels the conclusion that we should decline to review Compton's sexual abuse of a minor verdicts.

_____

[3] *Fowlkes v. State*, 2021 WL 3076856 (Alaska App. July 21, 2021) (unpublished).

At trial, Fowlkes was found guilty of first-degree sexual assault, first-degree sexual abuse of a minor, and second-degree sexual abuse of a minor for sexual conduct against a fourteen-year-old.[4] Of Fowlkes's two guilty verdicts for the sexual abuse of a minor charges, one charge (the first-degree charge) was for engaging in sexual penetration with a minor while occupying a position of authority in relation to the minor, while the other charge (the second-degree charge) was for engaging in sexual penetration with a minor, *without* a position of authority finding.[5]

On appeal, Fowlkes challenged the sufficiency of the evidence to support the "position of authority" finding related to the guilty verdict for first-degree sexual abuse of a minor.[6] We held that the challenge was moot because the three guilty verdicts should have been entered as "a single merged conviction."[7] Notably, had Fowlkes prevailed in challenging the "occupies a position of authority" element of first-degree sexual abuse of a minor, the guilty verdict for that offense would have been vacated, but the jury's guilty verdict for second-degree sexual abuse of a minor would have been unaffected.[8]

Here, in contrast to *Fowlkes*, all of Compton's sexual abuse of a minor offenses required the State to prove that Compton occupied a position of authority in relation to K.H. Thus, if Compton prevails in challenging the "occupies a position of authority" element, all of Compton's sexual abuse of a minor guilty verdicts would be vacated, and Compton would have no record that the jury found him guilty of sexual abuse of a minor in any degree.

---

[4]   *Id.* at *1.

[5]   *Id.*

[6]   *Id.*

[7]   *Id.*; *see also id.* at *2, *4-5.

[8]   *See id.* at *1.

On appeal, Compton argues that he may face collateral consequences from the sexual abuse of a minor guilty verdicts even though the offenses merged and convictions were never entered. He points out that the guilty verdicts remain on his judgment, and he asserts that the existence of these guilty verdicts could affect his safety in prison while serving his sentence, could affect how the provider of his court-ordered sex offender treatment chooses to structure the treatment, and could impact his probation due to probation conditions requiring him to inform certain persons of his sexual criminal history.

"[A] criminal case is moot only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction."[9] This is because "most criminal convictions do in fact entail adverse collateral legal consequences" and "[t]he mere 'possibility' that this will be the case is enough to preserve a criminal case from ending 'ignominiously in the limbo of mootness.'"[10]

Accordingly, because there is a possibility of collateral consequences stemming from the jury's guilty verdicts for the sexual abuse of a minor charges in this case that would be eliminated if Compton prevails on his challenges to those charges, we will consider Compton's challenges to the sexual abuse of a minor charges on appeal.

---

[9] *Sibron v. New York*, 392 U.S. 40, 57 (1968); *see also Mead v. State*, 504 P.2d 855, 856 n.1 (Alaska 1972).

[10] *Sibron*, 392 U.S. at 55 (quoting *Parker v. Ellis*, 362 U.S. 574, 577 (1960) (Warren, C.J., dissenting)); *see also id.* at 56-57 ("The question of the validity of a criminal conviction can arise in many contexts, and the sooner the issue is fully litigated the better for all concerned. It is always preferable to litigate a matter when it is directly and principally in dispute, rather than in a proceeding where it is collateral to the central controversy." (citation omitted)).

*(2) There was sufficient evidence to support the jury's guilty
verdicts for sexual abuse of a minor*

Compton's first challenge to the sexual abuse of a minor guilty verdicts is that there was insufficient evidence to establish that he occupied a position of authority in relation to K.H. When we review the sufficiency of the evidence to support a verdict, we are required to view the evidence, and all reasonable inferences to be drawn from that evidence, in the light most favorable to upholding the verdict.[11] The evidence is sufficient if "a reasonable fact-finder could have concluded that the State's case was proved beyond a reasonable doubt."[12]

Under Alaska law, a person commits second- or fourth-degree sexual abuse of a minor under AS 11.41.436(a)(6) and AS 11.41.440(a)(2), respectively, "if, being 18 years of age or older, the offender engages in [sexual penetration or sexual contact] with a person who is 16 or 17 years of age and at least three years younger than the offender, and the offender occupies a position of authority in relation to the victim."

At the time of Compton's offenses, the phrase "position of authority" was defined as follows:

> "[P]osition of authority" means an employer, youth leader, scout leader, coach, teacher, counselor, school administrator, religious leader, doctor, nurse, psychologist, guardian ad litem, babysitter, or a substantially similar position, and a police officer or probation officer other than when the officer is exercising custodial control over a minor.[13]

---

[11]  *Johnson v. State*, 188 P.3d 700, 702 (Alaska App. 2008).

[12]  *Id.*

[13]  Former AS 11.41.470(5) (2018). The current definition of "position of authority" is:

> "[P]osition of authority" means one of the following, or a person in a substantially similar position: an employer, youth leader, scout leader, coach, teacher, counselor, school administrator, religious leader, doctor, nurse, psychologist, guardian ad litem, babysitter, police officer, correctional employee, juvenile facility staff, staff member of a treatment institution, or

We construed the definition of "position of authority" in *Wurthmann v. State*.[14] In *Wurthmann*, we declined to give "the narrowest meaning allowed by the language" to the definition and instead adopted "a reasonable or common sense construction, consonant with the objectives of the legislature."[15] Based on the letter of intent that the legislature adopted when it promulgated the definition of "position of authority," we concluded that the definition was "intended to extend the reach of the sex abuse statutes to persons 'in positions that enable them to exercise undue influence over children.'"[16]

---

juvenile or adult probation officer other than when the officer or staff member is exercising custodial control over a minor[.]

AS 11.41.470(6).

[14] *Wurthmann v. State*, 27 P.3d 762, 764-66 (Alaska App. 2001).

[15] *Id.* at 766 (quoting *Conner v. State*, 696 P.2d 680, 682 (Alaska App. 1985)).

[16] *Id.* (quoting Letter of Intent for S.B. 355, 1990 House Journal 4199) (citing 1990 Senate Journal 4220; Minutes of Senate Judiciary Committee, S.B. 355 (January 23, 1990)). The letter of intent states in full:

> As used in AS 11.41.470, a "position of authority" is a position that enables an offender to exercise undue influence over the victim. The definition is intended to include those persons covered under the current law that makes it a crime to have sexual penetration or contact with a person under age 16 who is "temporarily entrusted to the offender's care" and to extend the definition to include other persons, such as police officers and guardians ad litem, who are in positions that enable them to exercise undue influence over children.
>
> Employers are specifically included in the definition of position of authority. In the context of AS 11.41.434-11.41.440, an employer is a natural person who owns a business or operates an agency. A direct job supervisor with hiring and firing authority is in a position substantially similar to that of an employer.
>
> The nature of an adult's position of authority in relation to the victim determines the duration of the prohibition against sexual relations between the adult and child. For example, the relationship of authority between a child and the child's teacher may continue even during the intervals between

The defendant in *Wurthmann*, who was the live-in boyfriend of the victim's mother and the victim's *de facto* stepfather and primary caretaker, argued that he did not occupy a position of authority over the victim based on a narrow statutory interpretation of that term.[17] We instead agreed with the State that "it would be unreasonable to attribute to the legislature an intent to impose criminal liability on a babysitter or teacher but not a live-in boyfriend who assumes the role of a stepfather and is even better positioned to manipulate a child in his care."[18] And we concluded, "Because Wurthmann assumed authority over [the victim] not just as her mother's live-in boyfriend, but as [the victim's] stepfather and primary caretaker, a reasonable jury could conclude that he exercised undue influence over [the victim] and was in a 'position of authority[.]'"[19]

In this appeal, Compton argues that there was insufficient evidence that he occupied a position of authority in relation to K.H. because he hired K.H. only for a "one-time job." He notes that, in its Letter of Intent, the legislature defined an "employer" for purposes of the definition of "position of authority" as "a natural person who owns a business or operates an agency," and gave as an example of someone in a "substantially similar position" to an "employer" "[a] direct job supervisor with hiring and firing authority."[20] Compton contends that "hiring a babysitter for a one-time job"

---

classes. On the other hand, an adult who volunteers to chaperone a single school dance does not thereby automatically create a continuing relationship of authority with all students attending the dance.

Letter of Intent for S.B. 355, 1990 House Journal 4199; *see also* 1990 Senate Journal 4220.

[17]  *Wurthmann*, 27 P.3d at 765-66.

[18]  *Id.* at 766.

[19]  *Id.*

[20]  Letter of Intent for S.B. 355, 1990 House Journal 4199; *see also* 1990 Senate Journal 4220; *Smith v. State*, 1992 WL 12153299, at *1-2 (Alaska App. Sept. 16, 1992)

does not "confer[] on those who participate in the hiring a position allowing them to 'exercise undue influence' over the babysitter," and that a conclusion that there is sufficient evidence that he was in a position of authority over K.H. would seemingly apply equally to "any circumstances involving hiring a person on a single occasion to perform a specific task," such as a plumber hired for a repair or a taxi driver hired for a ride. Compton argues that this result would impermissibly broaden the statutory definition of "position of authority" "far beyond its core focus on relationships of authority and trust."

We agree with Compton that a person who hires someone for an odd job on a single occasion is not substantially similar to an employer absent additional facts that demonstrate the ability of the person to exert undue influence over the hiree. A person who informally hires someone for a relatively brief task would seem to be much further from "a natural person who owns a business or operates an agency" than is "[a] direct job supervisor with hiring and firing authority."[21]

But we disagree with Compton's characterization of the position he held in relation to K.H. and the degree of influence that he had over K.H. Here, the jury heard evidence that Compton communicated directly with K.H.'s grandmother about whether K.H. would be able to babysit the children. The State presented evidence that K.H.'s grandmother came into Compton's house and met with Compton before allowing K.H. to stay in the house overnight. The grandmother also entrusted Compton with the responsibility to ensure that K.H. took her medication. In addition, unlike a typical babysitting situation, Compton was on the property the entire time that K.H. was

---

(unpublished) (concluding based on the language of the letter of intent that the defendant was in a position of authority over a minor he hired and supervised at a bus company).

[21] *See Fowlkes v. State*, 2021 WL 3076856, at \*13 (Alaska App. July 21, 2021) (Mannheimer, J., concurring) (unpublished) (alteration in original) (quoting Letter of Intent for S.B. 355, 1990 House Journal 4199).

in the home, and K.H. was reliant on Compton for a place to stay the night and a ride back to her home the next day.

Viewing the facts in the light most favorable to upholding the jury's verdict, we conclude that a reasonable juror could find that, at the time Compton engaged in sexual penetration and sexual conduct with K.H., he was in a position of sufficient supervisory authority over K.H. that he qualified as occupying a position of authority in relation to her.

We therefore conclude that there was sufficient evidence to support the guilty verdicts for the sexual abuse of a minor counts.

### (3) The culpable mental state of "recklessly" applies to the "occupies a position of authority" element of AS 11.41.436(a)(6) and AS 11.41.440(a)(2)

In Alaska, the age of sexual consent is generally sixteen years old.[22] Thus, it is generally not a crime for an adult to engage in sexual penetration or sexual contact with a sixteen- or seventeen-year-old. But it becomes a crime when "the offender occupies a position of authority in relation to the victim."[23]

Under AS 11.41.436(a)(6) and AS 11.41.440(a)(2), a person is guilty of second- or fourth-degree sexual abuse of a minor "if, being 18 years of age or older, the offender engages in [sexual penetration or sexual contact] with a person who is 16 or 17 years of age and at least three years younger than the offender, and the offender occupies a position of authority in relation to the victim."

---

[22] *See Anderson v. State*, 547 P.3d 1055, 1058 (Alaska App. 2024). Sexual abuse of a minor offenses take into account the age of the offender and victim, as well as the nature of the relationship between the offender and victim. *See, e.g.*, AS 11.41.436.

[23] AS 11.41.436(a)(6); AS 11.41.440(a)(2).

In Compton's case, the superior court provided the pattern jury instructions for AS 11.41.436(a)(6) and AS 11.41.440(a)(2) to the jury, which traces the language of the statutes:

> To prove that the defendant committed [sexual abuse of a minor in the second degree or fourth degree], the state must prove beyond a reasonable doubt each of the following elements:
>
> (1)    the defendant knowingly engaged in [sexual penetration or sexual contact] with K.H.;
>
> (2)    the defendant was 18 years of age or older at the time of the [sexual penetration or sexual contact];
>
> (3)    K.H. was 16 or 17 years of age at the time of the [sexual penetration or sexual contact];
>
> (4)    K.H. was at least three years younger than the defendant at the time of the [sexual penetration or sexual contact]; and
>
> (5)    at the time of the [sexual penetration or sexual contact], the defendant occupied a position of authority in relation to K.H.[24]

On appeal, Compton argues that the culpable mental state of "recklessly" applies to the "position of authority" element in these two sexual abuse of a minor statutes and that this culpable mental state should have been included in the jury instructions. The State contends that the "position of authority" element is a strict liability element — *i.e.*, that no culpable mental state is required for this element — and therefore that there was no error in the jury instructions. Because Compton did not argue in the superior court that the jury instructions should have included the "recklessly"

---

[24] Alaska Criminal Pattern Jury Instruction AS 11.41.436(a)(6) (2009); Alaska Criminal Pattern Jury Instruction AS 11.41.436(a)(2) (2002).

culpable mental state or otherwise contest his culpable mental state at trial, he must show plain error.[25]

> *(a) Why a culpable mental state must attach to the "occupies a position of authority" element in AS 11.41.436(a)(6) and AS 11.41.440(a)(2)*

As already noted, it generally is not a crime for an adult to engage in sexual penetration or sexual contact with a sixteen- or seventeen-year-old. But it becomes a crime when "the offender occupies a position of authority in relation to the victim."[26] Under well-established law, some degree of criminal culpability must attach to the fact that turns otherwise legal conduct into a crime.[27] It therefore follows that some degree of criminal culpability must attach to the "occupies a position of authority" element of AS 11.41.436(a)(6) and AS 11.41.440(a)(2), the statutory provision under which Compton was prosecuted.

This reasoning is consistent with AS 11.81.600(b), which provides a presumption in favor of assigning culpable mental states to crimes:

> A person is not guilty of an offense unless the person acts with a culpable mental state, except that no culpable mental state must be proved
>
> > (1) if the description of the offense does not specify a culpable mental state and the offense is
> >
> > > (A) a violation; or
> > >
> > > (B) designated as one of "strict liability"; or

---

[25]  *E.g.*, *Adams v. State*, 261 P.3d 758, 764 (Alaska 2011).

[26]  AS 11.41.436(a)(6); AS 11.41.440(a)(2).

[27]  *Jordan v. State*, 367 P.3d 41, 49 (Alaska App. 2016), *rev'd on other grounds*, 420 P.3d 1143 (Alaska 2018); *see also State v. Rice*, 626 P.2d 104, 107-08 (Alaska 1981); *State v. Guest*, 583 P.2d 836, 838-39 (Alaska 1978).

(2) if a legislative intent to dispense with the culpable
mental state requirement is present.

Sexual abuse of a minor is not designated as a strict liability offense.[28] And the State points to no legislative intent to dispense with a culpable mental state.

We acknowledge that it is also true that, under well-established law, "no culpable mental state need attach to circumstances rendering an offense more or less serious when a culpable mental state attaches to the core conduct of the offense itself."[29] But the fact that the defendant occupies a position of authority in relation to a victim who is otherwise above the age of sexual consent is not merely a circumstance that renders these offenses more serious. Instead, in the context presented here, the "position of authority" element is a circumstance that distinguishes conduct that is legal from conduct that is criminal. That is, without proof of that circumstance, the defendant's conduct would not be a crime at all.[30]

The State notes that "the defendant's belief concerning the victim's age is not an element of the crime in sexual abuse of a minor offenses," and it argues that the same rule should apply to a defendant's belief as to his position relative to the victim. But the legislature specifically provided for a mistake-of-age affirmative defense in sexual abuse of a minor offenses.[31] And the legislature's decision in 1978 to provide for a mistake of age defense, as well as its explanation of this defense in the Commentary

---

[28]  AS 11.41.434-.440.

[29]  *Noblit v. State*, 808 P.2d 280, 284 (Alaska App. 1991); *see also Bell v. State*, 668 P.2d 829, 833-35 (Alaska App. 1983); *Ortberg v. State*, 751 P.2d 1368, 1374 (Alaska App. 1988); *Hoople v. State*, 985 P.2d 1004, 1005-06 (Alaska App. 1999); *Jordan*, 367 P.3d at 47.

[30]  *See Noblit*, 808 P.2d at 284-85.

[31]  SLA 1978, ch. 166, § 3; former AS 11.41.445(b) (1980 to 2002); AS 11.41.445(b).

to the Revised Criminal Code, therefore reflects a "legislative intent to dispense with the culpable mental state requirement" with respect to this element.[32]

There is no similar indication that the legislature, when it introduced a new theory of liability for sexual abuse of a minor in 1990, intended to dispense with a culpable mental state requirement for those crimes which made otherwise legal conduct illegal. Because the "position of authority" element, when applied to older teenagers above the age of sexual consent, is what separates otherwise legal conduct from serious criminal conduct, attaching no mental state requirement to the "position of authority" element would render the crime itself a strict liability crime, in violation of AS 11.81.600(b). This would produce the "legally unsupportable" result of "a serious crime without the requirement of criminal intent."[33]

This leaves the question of what culpable mental state applies to the "occupies a position of authority" element in relation to AS 11.41.436(a)(6) and AS 11.41.440(a)(2). Alaska Statute 11.81.610(b) provides:

> Except as provided in AS 11.81.600(b), if a provision of law defining an offense does not prescribe a culpable mental state, the culpable mental state that must be proved with respect to
>
> > (1) conduct is "knowingly"; and
> >
> > (2) a circumstance or a result is "recklessly."

---

[32] AS 11.81.600(b); Commentary to Alaska's Revised Criminal Code, 1978 Senate Journal Supplement No. 47 (June 12), at 25. The existence of the affirmative age defense also means that a defendant who is reasonably mistaken about a victim's age is not held criminally culpable. *See Steve v. State*, 875 P.2d 110, 123 (Alaska App. 1994) ("We do not believe that society's basic notions of justice and fairness are violated when the law imposes criminal liability on a defendant (1) who has sex with an under-age child, (2) who claims that he or she made a mistake concerning the victim's age, but (3) who can not show that the mistake was a reasonable one.").

[33] *State v. Guest*, 583 P.2d 836, 838 (Alaska 1978). We express no opinion as to whether a mental state applies to an offense involving a "position of authority" when the teenager is below the general age of sexual consent.

Whether the defendant "occupies a position of authority in relation to the victim" is a "circumstance." Given that no culpable mental state appears in the sexual abuse of a minor statutes with respect to the "occupies a position of authority" element, and given that there is no expression of contrary legislative intent, the appropriate culpable mental state is "recklessly."

We reached the same result when construing Alaska's sexual assault statutes. Under the common law of rape, "[t]he government had to prove that the defendant voluntarily committed an act of sexual intercourse [and] the victim's lack of consent[,] [but] the government did not have to prove that the defendant was subjectively aware of [the victim's lack of consent]."[34] But "[t]he potential harshness of this rule was mitigated by the common law requirement that in order for the state to prove the absence of consent, it must show that the victim 'resisted to the utmost.'"[35]

When the legislature promulgated the Revised Criminal Code, it expressly rejected any requirement that the victim resist the sexual assault.[36] In *Reynolds v. State*, the defendant argued that the removal of this resistance requirement rendered Alaska's new sexual assault statutes unconstitutional.[37] We rejected this constitutional challenge

---

[34] *Steve*, 875 P.2d at 115; *see also Reynolds v. State*, 664 P.2d 621, 623 (Alaska App. 1983) ("The state was required to prove that the defendant intentionally engaged in the prohibited conduct, *i.e.*, sexual intercourse to which the complaining witness had not consented. However, it was not necessary for the state to prove that the defendant knew or should have known that the victim did not consent.").

[35] *Reynolds*, 664 P.2d at 623.

[36] *See id.* at 624 ("Alaska has dispensed with any requirement that the victim resist at all."); SLA 1978, ch. 166, § 3; former AS 11.41.470(3)(A) (1980) ("'[W]ithout consent' means that a person . . . *with or without resisting*, is coerced by the use of force against a person or property, or by the express or implied threat of imminent death, imminent physical injury, or imminent kidnapping to be inflicted on anyone[.]" (emphasis added)).

[37] *Reynolds*, 664 P.2d at 623-25.

because we concluded that the legislature intended for the culpable mental state of "recklessly" to apply to the "without consent" element of sexual assault:

> Lack of consent [under Alaska's sexual assault statutes] is a "surrounding circumstance" which under the Revised Code, requires a complementary mental state as well as conduct to constitute a crime. No specific mental state is mentioned in AS 11.41.410(a)(1) governing the surrounding circumstance of "consent." Therefore, the state must prove that the defendant acted "recklessly" regarding his putative victim's lack of consent.[38]

We explained that "[t]his requirement [that a defendant be reckless as to the victim's lack of consent] serves to protect the defendant against conviction for . . . sexual assault where the circumstances regarding consent are ambiguous at the time he has intercourse with the complaining witness."[39]

The "position of authority" element in AS 11.41.436(a)(6) and AS 11.41.440(a)(2), like the "without consent" element in the sexual assault statutes, transforms what might otherwise be legal sexual conduct into criminal conduct. Requiring that a defendant be reckless as to this element similarly ensures that a defendant is not held criminally culpable where the defendant reasonably was not aware of the circumstances that placed them in a position of authority (*i.e.*, that made their otherwise legal conduct criminal).

We therefore agree with Compton that the State must prove that a defendant was at least reckless as to whether they occupied a position of authority in relation to the victim in order for the defendant to be guilty of sexual abuse of a minor under AS 11.41.436(a)(6) and AS 11.41.440(a)(2).

---

[38] *Id.* at 625 (citing *Neitzel v. State*, 655 P.2d 325, 329, 334 (Alaska App. 1982)).

[39] *Id.*

> *(b) Why the failure to specify that a "recklessly" culpable mental state applied to the "position of authority" element was not plain error given how this case was litigated*

In *Jordan v. State*, the Alaska Supreme Court held that the failure to instruct the jury on a "contested" element of an offense is structural error — *i.e.*, error that requires reversal regardless of prejudice.[40] Compton, however, raises *Jordan* only in his reply brief, presumably because he failed to "contest" the culpable mental state of "recklessly" at his trial.

In *Alvarado v. State*, we noted that the Alaska Supreme Court's use of the term "contested" in *Jordan* was "potentially ambiguous."[41] It could mean that "the defendant preserved his objection to the trial court's omission of an essential element from the jury instructions," or it could mean that "the defendant actively disputed the element as part of his defense at trial."[42]

Here, the record is clear that Compton did not "contest" the applicable *mens rea* in either sense of the word. That is, Compton did not request that the superior court instruct the jury that a "recklessly" culpable mental state applied to the "position of authority" element. And he also did not argue at trial that he was unaware that he occupied a position of authority over K.H. Indeed, he never argued against the position of authority element at all. Instead, his defense at trial was solely that the sexual penetration and sexual contact did not happen (or, as to K.H. touching his genitals, that he tried to stop it from happening).[43]

---

[40] *Jordan v. State*, 420 P.3d 1143, 1153-57 (Alaska 2018).

[41] *Alvarado v. State*, 440 P.3d 329, 333 n.14 (Alaska App. 2019).

[42] *Id.*

[43] *See id.* (noting that "the potential ambiguity of the term 'contested' [was] irrelevant . . . because [the defendant] failed to 'contest' [the element] in either sense of the term").

On appeal, Compton concedes that he can obtain reversal of the guilty verdicts for sexual abuse of a minor only if he can show plain error. "Plain error is an error that (1) was not the result of intelligent waiver or a tactical decision not to object; (2) was obvious; (3) affected substantial rights; and (4) was prejudicial."[44] "[C]onstitutional violations are always prejudicial unless the State proves they are harmless beyond a reasonable doubt."[45]

We conclude that the failure to instruct the jury that Compton had to be reckless as to whether he occupied a position of authority is harmless beyond a reasonable doubt, and therefore not plain error, for the same reason that it is not structural error. That is, Compton did not request that the superior court instruct the jury that the "recklessly" culpable mental state applied to the "position of authority" element, nor did he argue that he was unaware that he occupied a position of authority over K.H. or even argue that he did not occupy a position of authority over K.H.

In *Sergie v. State*, we considered whether the failure of the trial court to instruct the jury that the "recklessly" culpable mental state applied to the "without consent" element of attempted first-degree sexual assault was plain error.[46] The trial court in *Sergie* instructed the jury that it should find Sergie guilty of attempted first-degree sexual assault if he "intended to engage in sexual penetration with [the victim] without regard to [her] lack of consent."[47]

We concluded that the failure to specify in the instructions that Sergie had to recklessly disregard the victim's lack of consent was not plain error. We explained that "there was no plain error because Sergie never argued that he was unaware of [the

---

[44] *Adams v. State*, 261 P.3d 758, 764 (Alaska 2011).

[45] *Id.* at 771.

[46] *Sergie v. State*, 105 P.3d 1150, 1155-56 (Alaska App. 2005).

[47] *Id.* at 1155 (second alteration in original).

victim's] lack of consent."[48] Instead, at trial, Sergie had defended on the grounds "that Sergie had been too intoxicated to form the intent to sexually penetrate [the victim], and that even if Sergie had formed this intent, he promptly renounced it when [the victim] indicated her unwillingness to engage in sexual relations."[49]

Compton's defense at trial was that the sexual penetration and sexual contact did not occur; he did not argue that he was not in a position of authority in relation to K.H. Compton did not challenge the testimony about K.H.'s position in his home at the time of the incident at issue. It was therefore undisputed at trial that Compton arranged for K.H. to babysit and stay in his house overnight without transportation and that he talked with K.H.'s grandmother about whether this would be appropriate.

We therefore conclude that the failure to specify in the jury instructions that Compton had to be reckless as to whether he occupied a position of authority in relation to K.H. was not plain error.

*Compton's challenge to the superior court's answer to a jury question*

We now turn to Compton's remaining merit issue, which relates to all of his guilty verdicts, including his sexual assault convictions.

After the jury began its deliberations, it submitted a question to the judge. The jury asked, "How much weight can we give to witness testimony in lieu of physical evidence?"

The superior court convened the parties to discuss a response to the jury's question. The court informed the parties that it believed "the answer to the jurors' question is found in" Instructions Nos. A-5 and A-9. Instruction No. A-5 stated, "At the

---

[48] *Id.*

[49] *Id.*

end of the trial, it will be your job to decide how much weight to give to the evidence and evaluate the evidence according to the instructions that the court will give you." Instruction No. A-9 informed the jury how to evaluate witness credibility and listed the relevant factors to consider.

The State agreed with the court that directing the jury to these two instructions was the proper response. Compton, however, requested that the court state that "the weight to give or not give any evidence *or lack of evidence* is a question for the jury." (Emphasis added.) The court declined to give Compton's proposed instruction. Instead, the court responded to the jury, "It is your job to decide how much weight to give the testimony and physical evidence. See Instruction No. A-5 and No. A-9."

On appeal, Compton argues that the court's response to the jury question was inadequate because it did not inform the jury that it could weigh a lack of evidence.

Under Alaska Criminal Rule 30(b), a trial court must generally "instruct the jury on all matters of law which it considers necessary for the jury's information in giving their verdict." If the jury asks a legal question while deliberations are underway, the scope of the court's discretion as to how to respond depends on existing jury instructions.[50] If the jury's question concerns a legal issue that the court has already adequately instructed on, the court may decline to provide further clarification.[51] But if the court's previous instructions were incorrect or insufficient, or if it is apparent from the jury's question that it misunderstands the law, the court has a duty to clarify the law.[52]

---

[50] *See Des Jardins v. State*, 551 P.2d 181, 190 (Alaska 1976).

[51] *Id.*

[52] *Id.*; *see also Turner v. State*, 552 P.3d 1077, 1080-82 (Alaska App. 2024); *Moffitt v. State*, 207 P.3d 593, 602-03 (Alaska App. 2009); *Glidden v. State*, 842 P.2d 604, 610-11 (Alaska App. 1992).

In this case, the instructions the jury had already received adequately explained how to weigh the evidence. Accordingly, the superior court acted within its discretion by directing the jury to those prior instructions.

Compton's argument that the instruction the court gave "implicitly directed the jury not to consider the lack of physical evidence that the jury's note identified" is not persuasive. Reasonable jurors, having asked how to weigh "witness testimony in lieu of physical evidence," would not understand the court's response that it was their job to decide how to weigh testimony and physical evidence as a direction to ignore a lack of physical evidence. Rather, they would understand the response as advising them that the court could not help them weigh the evidence.

We note, as does the State in its briefing, that the jury instructions in the case also included an instruction, Instruction No. A-4, which expressly stated that a reasonable doubt could be based on a lack of evidence. The existence of this instruction further undermines Compton's argument that the jury would have misunderstood the response that the superior court provided to its question and failed to appreciate that it could also weigh the lack of evidence.[53]

We therefore conclude that while the superior court, in its discretion, could have responded in the manner requested by Compton, it was not an abuse of discretion for the court to respond as it did.

*Compton's challenges to the probation search condition*

As we have previously stated, the superior court in this case entered convictions for one count of first-degree sexual assault and two counts of second-degree

---

[53] *See Kangas v. State*, 463 P.3d 189, 194 (Alaska App. 2020) ("[W]hen an appellate court reviews claims of error involving jury instructions, the question is not whether the challenged jury instruction might contain language that could be misinterpreted. Rather, the question is whether the jury instructions, taken as a whole, properly informed the jury of the applicable law.").

sexual assault. The court found that the "least serious" mitigator applied to the first-degree sexual assault conviction,[54] and it imposed a composite sentence of 22 years with 10 years suspended (12 years to serve), with 15 years of probation.

Among Compton's probation conditions is a special probation condition that authorizes suspicionless searches at the direction of his probation officer for sexually explicit material. Special Condition No. 10 states:

> Submit to a warrantless, non-consensual search directed by a probation officer of his person, personal property, residence, computer, electronic media devices in his possession, and any vehicle in which he is found for the presence of sexually explicit material or evidence of prohibited contact with the victim. The probationer shall provide the probation office any and all passwords or access codes used on the computer. Sexually explicit materials are defined as materials depicting conduct set forth in AS 11.41.455(a), regardless of whether the conduct depicted involved adults or minors.

Compton objected to this search condition at sentencing, arguing that such an expansive search should be conditioned on a finding of reasonable suspicion.[55] The superior court overruled Compton's objection, ruling that suspicionless searches were important for deterrence. As part of its reasoning behind imposing this condition and the condition prohibiting possession of sexually explicit material, the court noted that Compton "showed homemade pornography, graphic pornography to the victim, and used it to attempt to encourage her to engage in similar conduct with himself."

---

[54]  *See* AS 12.55.155(d)(9).

[55]  Compton did not object to the broad definition of sexually explicit material and he does not object to this definition on appeal. *But see Galindo v. State*, 481 P.3d 686, 693-94 (Alaska App. 2021) (remanding for reconsideration a probation condition that included a prohibition against sexually explicit material involving adults because "the right to possess sexually explicit material involving adults is constitutionally protected under the First Amendment").

On appeal, Compton renews his challenge to Special Condition No. 10's suspicionless search. According to Compton, the Alaska Constitution categorically prohibits suspicionless searches of a probationer's home. In support of this argument, Compton points to Alaska's heightened constitutional protections of liberty and privacy, particularly in the home.[56] He also points to commentary by Professor LaFave that the "prevailing view" is to require reasonable suspicion for probation searches of the home.[57]

In response, the State refers to *Samson v. California*, in which the United States Supreme Court upheld suspicionless searches of parolees under the Federal Constitution.[58] The State also argues that the Alaska Supreme Court has already decided this issue in *Roman v. State*.

We agree with the State that the Alaska Supreme Court has already decided this issue. The parolee in *Roman* challenged a parole condition that authorized suspicionless searches, including suspicionless searches of his home.[59] In *Roman,* the Alaska Supreme Court held that probation and parole conditions that "unquestionably restrict otherwise inviolable constitutional rights" should "be subject to special scrutiny to determine whether the limitation does in fact serve the dual objectives of

---

[56] *See* Alaska Const. art. I, §§ 1, 14, 22; *see also State v. Planned Parenthood of Alaska*, 35 P.3d 30, 36 & n.28 (Alaska 2001); *Ravin v. State*, 537 P.2d 494, 498-504 (Alaska 1975).

[57] 5 Wayne R. LaFave, *Search and Seizure*, § 10.10(d), at 578-88 (6th ed. 2020); *see also State v. Fields*, 686 P.2d 1379, 1389-90 (Haw. 1984) (requiring reasonable suspicion as a matter of state constitutional law); *State v. Velasquez*, 672 P.2d 1254, 1260-61 (Utah 1983) (requiring reasonable suspicion); *Commonwealth v. LaFrance*, 525 N.E.2d 379, 381-83 (Mass. 1988) (holding that the reasonable suspicion standard protects the public interest while also protecting probationers from unwarranted intrusions into privacy).

[58] *Samson v. California*, 547 U.S. 843, 847 (2006) (concluding that parole conditions authorizing suspicionless searches are constitutional under the U.S. Constitution).

[59] *Roman v. State*, 570 P.2d 1235, 1237-38 (Alaska 1977).

rehabilitation and public safety" and whether the conditions are unduly restrictive of liberty.[60] The court therefore held that "warrantless searches of parolees or probationers and their residences should not be countenanced unless there is a direct relationship of the searches to the nature of the crime for which the parolee was convicted."[61] But the supreme court also concluded that the suspicionless search condition at issue in *Roman* satisfied this standard.[62]

The Alaska Supreme Court repeated this reasoning, and expressly stated that no amount of suspicion was necessarily required, in *Soroka v. State*.[63] The defendant in *Soroka* was charged with a new crime and a probation violation after a search of his residence by a probation officer revealed license plates from a recently stolen car.[64] Soroka's probation conditions did not authorize searches of his home, and therefore his probation officer needed probable cause to search the home.[65] Soroka

---

[60] *Id.* at 1241 (quoting *United States v. Consuelo-Gonzalez*, 521 F.2d 259, 265 (9th Cir. 1975)); *see also Sprague v. State*, 590 P.2d 410, 417-18 (Alaska 1979) (applying this standard to a probation condition). In *State v. Ranstead*, 421 P.3d 15, 19-20 (Alaska 2018) and *State v. Pulusila*, 467 P.3d 211, 219 (Alaska 2020), the supreme court noted that Article I, Section 12 of the Alaska Constitution had since been amended to include additional principles of criminal administration and that these additional principles may inform the analysis. *Compare* former Alaska Const. art. I, § 12 (pre-1994) ("Penal administration shall be based on the principle of reformation and upon the need for protecting the public."), *with* Alaska Const. art. I, § 12 ("Criminal administration shall be based upon the following: the need for protecting the public, community condemnation of the offender, the rights of victims of crimes, restitution from the offender, and the principle of reformation.").

[61] *Roman*, 570 P.2d at 1242-43; *see also Sprague*, 590 P.2d at 417.

[62] *Roman*, 570 P.2d at 1243.

[63] *Soroka v. State*, 598 P.2d 69, 71 n.5 (Alaska 1979).

[64] *Id.* at 70.

[65] *Id.* at 71.

moved to suppress evidence obtained from the search, arguing that the probation officer did not have probable cause to search his home.[66] But the superior court denied the motion, and the supreme court later affirmed.[67]

In a footnote in its opinion in the case, the supreme court stated:

If the conditions of Soroka's probation had extended to searches on demand of his residence, no showing of probable cause would have been necessary. Searches authorized in connection with grants of probation or parole may be executed *without the need for additional justification*, as long as they are reasonably conducted and not made for purposes of harassment.[68]

This Court has also approved of probation conditions that authorized suspicionless searches of probationers. In *State v. James*, we construed a condition that required a probationer to "submit to a search of [his] person, personal property, residence[,] or any vehicle in which [he might] be found for the presence of contraband" as authorizing suspicionless searches.[69] We did so in the face of the probationer's argument that interpreting the condition as allowing suspicionless searches would create a constitutionally suspect result.[70] And in *Brown v. State*, we rejected a probationer's argument that "even when a probationer is subject to a probation condition that seemingly authorizes a probation officer to conduct suspicionless searches, a probation officer has no legal authority to search a probationer unless the

---

[66] *Id.* at 70.

[67] *Id.* at 70-71.

[68] *Id.* at 71 n.5 (emphasis added) (first citing *State v. Montgomery*, 566 P.2d 1329 (Ariz. 1977); then citing *People v. Mason*, 488 P.2d 630 (Cal. 1971); then citing *State v. Schlosser*, 202 N.W.2d 136 (N.D. 1972); and then citing *Roman v. State*, 570 P.2d 1235, 1242 & n.19 (Alaska 1977)).

[69] *State v. James*, 963 P.2d 1080, 1081-84 (Alaska App. 1998) (alterations in original).

[70] *Id.* at 1083.

officer has a reasonable suspicion that the probationer is currently engaged in criminal behavior."[71] We stated that this argument was "wrong" and that "no particularized suspicion was necessary" but that, "[i]n any case," the argument was not preserved because it was not raised in the superior court.[72]

Compton argues that the language in *Soroka*, *James*, and *Brown* is *dicta* because the underlying issue in each case was not a constitutional challenge to suspicionless-search probation conditions. We agree that the supreme court's statement in the footnote in *Soroka* was *dicta*. The court expressly stated that the probation conditions at issue in the case did not authorize the search.[73] The purpose of the footnote was to state that a probation condition could have authorized such a search.[74] But the footnote in *Soroka* merely made explicit what was necessarily implied in *Roman*. As explained above, the supreme court in *Roman* concluded that a suspicionless-search probation condition comported with constitutional limitations on probationers' rights.[75]

The same is true of our assertions in *Brown*. Compton is correct that our ultimate rejection of the probationer's argument in that case was based on the probationer's failure to preserve the argument.[76] But our remark that "no particularized suspicion was necessary"[77] reflected binding precedent based on the disposition in *Roman*.

---

[71]  *Brown v. State*, 127 P.3d 837, 842 (Alaska App. 2006).

[72]  *Id.* at 843.

[73]  *Soroka*, 598 P.2d at 71.

[74]  *Id.* at 71 n.5.

[75]  *Roman v. State*, 570 P.2d 1235, 1238-44 (Alaska 1977).

[76]  *Brown*, 127 P.3d at 843.

[77]  *Id.*

Finally, while the ultimate issue in *James* was the interpretation of the meaning of a search probation condition, we concluded that the condition authorized suspicionless searches and did so over the probationer's contention that this would be constitutionally problematic — implicitly rejecting the constitutional argument Compton now makes.[78]

We therefore reject Compton's argument that the Alaska Constitution categorically prohibits probation conditions from authorizing suspicionless searches of a probationer's home.[79]

This does not mean, however, that courts should automatically impose suspicionless searches of probationers' homes in all instances where a search condition is otherwise supported. Trial courts retain the discretion to limit the invasiveness of a probation search condition by conditioning it on reasonable suspicion. Indeed, such limitations may help ensure that any search authorized by a probation condition is "reasonably conducted and not made for the purpose of harassment."[80]

In the current case, Compton takes issue with the breadth of the suspicionless search condition imposed by the court. Compton points out that the search condition extends not only to his home but also to his cell phone and computer, which have been recognized as having heightened privacy protections in our case law.[81] Compton argues that, even if reasonable suspicion for probation searches is not required

---

[78] *State v. James*, 963 P.2d 1080, 1083 (Alaska App. 1998).

[79] *See also Samson v. California*, 547 U.S. 843, 847 (2006) (concluding that parole conditions authorizing suspicionless searches are constitutional under the U.S. Constitution).

[80] *Soroka v. State*, 598 P.2d 69, 71 n.5 (Alaska 1979).

[81] *See, e.g.*, *Ridenour v. State*, 539 P.3d 530, 539 (Alaska App. 2023); *Pohland v. State*, 436 P.3d 1093, 1100 n.5 (Alaska App. 2019); *see also Riley v. California*, 573 U.S. 373, 394-97 (2014).

as a matter of law, the superior court was still required to affirmatively decide, as part of the special scrutiny analysis, whether a suspicionless search was the least restrictive alternative given the circumstances of the case.

We agree with Compton that, as a general matter, courts should be cautious in imposing broad-ranging search conditions of a probationer's home and a probationer's personal electronic devices without the additional protections provided by a reasonable suspicion requirement. Because the record indicates that the superior court provided only conclusory reasons for its decision to reject a reasonable suspicion requirement, we remand this case to the superior court. On remand, the superior court shall subject Special Probation Condition No. 10 to special scrutiny and determine whether the least restrictive alternative requires imposition of a suspicionless search condition for sexually explicit material in this case.

*Conclusion*

We REMAND this case for reconsideration of Special Condition of Probation No. 10. The judgment of the superior court is otherwise AFFIRMED.

Judge TERRELL, concurring in part and dissenting in part.

I concur fully with the majority's conclusion that the culpable mental state of "recklessly" applies to the "position of authority" element in those sexual abuse of a minor statutes where the element is used to render criminal what would otherwise be non-criminal conduct.[1] And I concur with the majority's assessment that the failure to instruct the jury on this element did not amount to plain error. But I disagree that there was sufficient evidence to support the "position of authority" element, and I would reverse the sexual abuse of a minor verdicts.[2]

In terms of the sufficiency of the evidence to support Compton's sexual abuse of a minor verdicts, the analysis hinges on whether there was evidence to support the theory that the State pursued. In its opening statement, the State asserted that Compton exercised a "position of authority" (as that term is defined in AS 11.41.470) in relation to K.H. because he was her "employer." And in closing argument, the State added in the claim that he occupied a position "substantially similar" to that of an employer. Having carefully reviewed the history of the 1990 legislation that added the "position of authority" definition to AS 11.41.470, I agree with Judge Mannheimer's concurrence in *Fowlkes v. State*, which rejected the claim that a minor's former junior high school tutor/resource aide became the minor's "employer" by paying the minor to help him move on a single occasion.[3] Judge Mannheimer recognized that Fowlkes did not meet the primary definition of an "employer" set out in the legislative history, *i.e.*,

---

[1]  *See* AS 11.41.434-.436 and .440.

[2]  I also concur fully with the majority's resolution of Compton's challenge to the court's answer to a jury question and with its resolution of Compton's challenge to his probation conditions.

[3]  *Fowlkes v. State*, 2021 WL 3076856, at *13 (Alaska App. July 21, 2021) (Mannheimer, J., concurring) (unpublished).

Fowlkes did not "own[] a business or operate[] an agency."[4] Judge Mannheimer also concluded that to the degree the State was asserting that Fowlkes occupied a position that was "substantially similar" to this definition of an "employer" because he hired the minor to do an odd job (*i.e.*, to help him move), such argument was error. Judge Mannheimer concluded his analysis of this issue by stating:

> Given this legislative history, and given the fact that Fowlkes was acting as a private person (*i.e.*, not as a business owner) when he offered C.N. money in exchange for one afternoon's work, I conclude that the State is wrong when it argues that Fowlkes was C.N.'s "employer", or that Fowlkes occupied a substantially similar position. The evidence was not legally sufficient to establish that Fowlkes was C.N.'s "employer" within the definition adopted by the legislature.[5]

I agree with this analysis. Applying it to the facts of this case, I conclude that Compton was not K.H.'s "employer," nor did he occupy a "substantially similar position" to that of an employer merely by virtue of having paid K.H. on a single occasion to babysit his children, and would reverse Compton's sexual abuse of a minor verdicts on this basis.

I note that my interpretation of the statute is far from a tacit endorsement of Compton's conduct. Society's understanding of the dynamics of various types of sexual misconduct and harassment has broadened since this legislation was passed thirty-five years ago, in 1990, and the legislature might well draft the statute to cover such conduct if it were writing on a blank slate today. But our task is to discern what the 1990 legislature meant when it enacted the statute, and, for the reasons set out above, I conclude the legislature did not intend to include such odd jobs within the rubric of an employer-employee relationship and that Compton's sexual abuse of a minor verdicts cannot be sustained when viewed in terms of the theories the State relied on.

---

4    *Id.* (quoting Letter of Intent for S.B. 355, 1990 House Journal 4199).

5    *Id.*